THE NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY, SUC-
CESSOR CORPORATION TO THE LAKE ERIE AND WESTERN RAILROAD
COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVE-
NUE, RESPONDENT.

THE NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY, PE-
TITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 15803, 26777.   Promulgated October 20, 1932.

*John H. Agate, Esq.*, and *George Elliott, Esq.*, for the petitioner.
*E. C. Algire, Esq.*, for the respondent.

1234

1238

1248

1252

OPINION.

STERNHAGEN : The respondent sent to the petitioner two notices of the same deficiency in the 1920 income tax of the former Lake Erie & Western Railroad Company, one treating the petitioner as the taxpayer and the other as a transferee of the taxpayer. From each notice, the petitioner, as the successor by consolidation, instituted a separate proceeding. It admits its liability for whatever deficiency may be held to be correct as to the Lake Erie. Both proceedings

were consolidated, since they were in their substantive issues identical. It is suggested either that the transferee proceeding should be dismissed or that it should be disposed of by a judgment of no transferee liability. Either of these courses, however, may involve unexpected results, for a dismissal is given, by section 1000, Revenue Act of 1926, amending section 906 (c), Revenue Act of 1924, the effect of affirming the deficiency determined by the Commissioner, and a judgment of no liability would, in view of the disposition of the issues, involve confusion. Cf. *Oswego Falls Corporation*, 26 B. T. A. 60. We shall proceed to consider the substantive questions at issue, leaving the judgment in both cases to be formulated later.

The first assignment of error in respect of the sidetrack donations has been conceded by respondent and needs no consideration. The next three assignments are controverted. The facts have, for convenience, been separated as far as they could be, under Roman numbers, in correlation with the opinion.

The question in the fifth assignment, in respect of the inclusion within the guaranty income of the normal tax, the facts of which appear under IV, is decided against petitioner by *Union Pacific R. R. Co. et al.*, 26 B. T. A. 1126.

## I.

The Lake Erie on its original and amended returns for 1920 took a deduction of $92,661.33, which it described as " loss sustained by reason of assignment of the lease of the Northern Ohio Railway Company to the Akron, Canton & Youngstown Railway Company effective March 1, 1920." This was the net debit amount shown on the Lake Erie's books at the time of the assignment purporting to represent the net amount claimed by the Lake Erie to be owing to it by the Northern Ohio. The respondent disallowed the deduction. The petitioner assails this disallowance and sets up in addition that it is entitled to the further deduction, not heretofore claimed, of " a loss of not less than $1,500,000 resulting from the sale, assignment and transfer to the Akron, Canton & Youngstown Railway Company, on March 1, 1920, of stock of the Northern Ohio Railway Company, of the lease of its properties to the Lake Erie, and of the Lake Erie's claim against the Northern Ohio Railway Company thereunder."

On March 1, 1920, the Lake Erie, pursuant to the agreement of December 11, 1919, transferred to the Akron Company, the lease of the Northern Ohio's railroad properties, dated October 1, 1895, 35,800 shares of the common and 21 shares of the preferred stock of the Northern Ohio, the net indebtedness of the Northern Ohio to the Lake Erie at March 1, 1920, and any claim that might accrue to the Lake Erie against the Northern Ohio by reason of the Lake

Erie's payment of certain interest, accruing after March 1, 1920, on the Northern Ohio's bonded indebtedness. In addition, the Lake Erie agreed to pay one year's interest on the Northern Ohio's bonded indebtedness, accruing after March 1, 1920. In consideration for the transfer, the Akron Company assumed all of the obligations and liability of the Lake Erie under the lease agreement, arising or accruing after March 1, 1920; agreed to save the Lake Erie harmless from any and all claims of the Northern Ohio, based upon any alleged deterioration of, or insufficiency in, the leased properties on the effective date of the agreement as compared with the date upon which the Lake Erie came into possession thereof; and assumed all of the obligations and liability of the Lake Erie upon its guaranties of the Northern Ohio's outstanding first mortgage bonds, both as to principal and interest.

The petitioner alleges that such of the transferred properties as were acquired before March 1, 1913, cost the Lake Erie $2,380,-514.59; that the fair market value of such properties, as of March 1, 1913, was at least $1,700,000; that the cost to the Lake Erie of such of the transferred properties as were acquired after March 1, 1913, was $122,539.85; and, therefore, that the Lake Erie sustained a loss of at least $1,822,539.85 from the transaction, which is deductible in computing net income for 1920, under section 234 (a) (4) of the Revenue Act of 1918. It recognizes that it must prove as to properties acquired before March 1, 1913, the lower of cost or value on that date, *Burnet* v. *Houston*, 283 U. S. 223, and as to subsequently acquired properties, the cost.

The respondent's position is that the Lake Erie acquired the lease and the stock without statutory cost; that the Northern Ohio's indebtedness to the Lake Erie, if any, on March 1, 1913, had no fair market value on that date; that, since, under section 202 (a) of the Revenue Act of 1918, any deductible loss from the disposition of property acquired before March 1, 1913, must be determined upon the basis of cost or fair market value as of that date, whichever is lower, the Lake Erie sustained no deductible loss upon the transfer to the Akron Company of the lease and stock, because they were acquired without cost, or upon the transfer of the Northern Ohio's indebtedness as of March 1, 1913, because such indebtedness had no fair market value on that date; and that any indebtedness of the Northern Ohio to the Lake Erie incurred after March 1, 1913, was worthless and uncollectible at the time incurred, and, consequently, should have been charged off prior to the taxable year in question.

At the time of the acquisition by the Lake Erie in 1895 of the lease and the 35,800 shares of common stock, no cost was paid or incurred, the consideration being entirely in promises. No one

seems to know when or how the 21 shares of preferred came to the Lake Erie, and from the record it is impossible to find whether it was acquired before or after March 1, 1913, if at all, and of course impossible to find a figure of cost.

From October 1, 1895, to March 1, 1920, the Lake Erie made net cash expenditures for the operation of the Northern Ohio's properties, for the payment of interest on the first mortgage bonds of the Northern Ohio and other fixed charges of the latter, and for additions and betterments to the said properties, in excess of operating revenues from those properties, in the total sum of $3,615,-564.45, of which $2,409,004.81 was expended before, and $1,206,559.64 after, March 1, 1913. The said total sum of $3,615,564.45, except $38,573.29 expended for additions and betterments after March 1, 1913, was charged by the Lake Erie to operating expenses, as and when paid or incurred. Of the amount so expended before March 1, 1913, sums aggregating $719,056.47 were taken as deductions from income by the Lake Erie in its corporation excise-tax returns for the years 1909 to 1912, inclusive, and the sum of $37,131.60 was taken as a deduction from income in its income-tax return for 1913. The total amount so expended after March 1, 1913, except $38,573.29 expended for additions and betterments, was deducted in income-tax returns for the years 1913 to 1920, inclusive. The petitioner has renounced any right to have any sums so deducted in income-tax returns for the years 1913 to 1920, inclusive, included in the basis for determining the amount of any deductible loss sustained by the Lake Erie in the transaction with the Akron Company, but claims that the basis should include the amounts deducted in the Lake Erie's excise-tax returns for 1909 to 1912, inclusive. In addition to the foregoing, the Lake Erie expended $72,998.33 before, and $51,307.50 after, March 1, 1913, for the purchase of securities of the Akron & Barberton Belt and for contributions to the Akron & Barberton Belt's sinking fund, all for the account of the Northern Ohio; and such expenditures were charged to the account of the Northern Ohio and no part thereof was deducted in the Lake Erie's income-tax returns. Thus the total net cash expenditures by the Lake Erie for the purposes above mentioned, not taken as deductions in its income-tax returns, were $2,444,871.54 before, and $89,880.79 after, March 1, 1913. Also the Lake Erie turned over to the Akron Company materials and supplies on the Northern Ohio's railroad at the end of Federal control, which, it is said, the Director General, in the final settlement of Federal control of the Lake Erie, inventoried and turned over to the latter, at a value of $32,659.06. The petitioner concedes that, for the purpose of arriving at total cost to the Lake Erie of the Northern Ohio's indebtedness trans-

ferred to the Akron Company, net cash expenditures should be offset by $64,356.95, depreciation and retirements of Northern Ohio properties deducted from income in the Lake Erie's income-tax return. Thus the petitioner computes the total cost to the Lake Erie of the Northern Ohio's indebtedness, as follows:

| | |
|---|---|
| Net cash expenditures before March 1, 1913 | $2,444,871.54 |
| Net cash expenditures after March 1, 1913 | 89,880.79 |
| Materials and supplies after March 1, 1913 | 32,659.06 |
| | 2,567,411.39 |
| Less: Depreciation and retirements of Northern Ohio property deducted in Lake Erie's income-tax returns | 64,356.95 |
| Cost of Northern Ohio's indebtedness | 2,503,054.44 |

The respondent says that all amounts expended by the Lake Erie for the operation of the leased properties, for the payment of interest on the first mortgage bonds of the Northern Ohio and other fixed charges of the latter, and for additions and betterments to the said leased properties, in excess of operating revenues from those properties, were, under the terms of the lease, rentals, a part of the Lake Erie's operating expenses, and, therefore, they may not be included in the cost basis for determining the Lake Erie's loss from the transaction with the Akron Company. On the other hand, the petitioner alleges that all such amounts were, under the terms of the lease, advances to the Northern Ohio, which the latter was obligated to repay, and such obligation was a part of the Northern Ohio's net indebtedness which the Lake Erie transferred to the Akron Company.

The agreement of December 11, 1919, by which the Lake Erie made the transfer to the Akron Company, does not state the nature or amount of the Northern Ohio's indebtedness so transferred. It provides, in section 3, that:

The Lake Erie Company hereby assigns and transfers to the Akron Company the Northern Ohio lease and all of the rights, obligations and interests of the Lake Erie Company thereunder save as hereinafter otherwise expressly provided;

and in section 5, it is provided that the Lake Erie assigns to the Akron Company:

The net indebtedness of the Ohio Company [Northern Ohio] to the Lake Erie Company accruing at, or for the period prior, to the effective date hereof, that is to say, the total indebtedness of the Ohio Company to the Lake Erie Company accrued at, or for the period prior to, the effective date hereof, less any indebtedness of the Lake Erie Company to the Ohio Company arising or accrued at, or for the period prior to, the effective date hereof and whether then due or deferred.

Prior to the effective date of the agreement, March 1, 1920, all such expenditures were, as heretofore pointed out, charged by the

Lake Erie to operating expenses. At the date of transfer, the Lake Erie's books showed the net indebtedness of the Northern Ohio to be $92,661.33, all of which represented charges for expenditures made by the Lake Erie for purchase of securities of the Akron & Barberton Belt and contributions to the Akron & Barberton Belt's sinking fund for the account of the Northern Ohio, for additions and betterments to the Northern Ohio's properties, and for materials and supplies on the Northern Ohio's railroad at the end of Federal control turned over by the Director General. A breakdown is included in the findings. On the other hand, the Northern Ohio consistently recorded on its books all expenditures by the Lake Erie in excess of operating revenues from the leased properties; so that on March 1, 1913, the Northern Ohio's books showed an indebtedness to the Lake Erie of $2,528,097.13, and on March 1, 1920, its books showed an amount due the Lake Erie of $3,825,049.98, and an amount due from the Lake Erie, for retirements and depreciation of leased properties, of $102,877.85, a net indebtedness of $3,722,172.13. Throughout the period 1902 to 1920, the accounts of both the Lake Erie and the Northern Ohio were kept under the general supervision of the general auditor of the New York Central Lines; and the " Green Book " issued annually by the general offices of the New York Central Lines, embracing all of the general financial statements of the various companies, contained balance sheets of the Northern Ohio, as of December 31 of each year, in which there was shown the Northern Ohio's indebtedness to the Lake Erie, in amounts conforming with those appearing in the Northern Ohio's books, although the balance sheets of the Lake Erie, likewise embraced therein, stated the Northern Ohio's indebtedness to it in different, and greatly less, amounts. Concurrently with the Lake Erie's assignment to the Akron Company, the Northern Ohio transferred on its books its indebtedness to the Lake Erie to the account of the Akron Company, crediting the latter with the sum of $3,825,049.98; and, at the same time, the Akron Company entered a similar amount on its books as the Northern Ohio's indebtedness to it by virtue of the Lake Erie's assignment. In view of these facts, it can not be said that the Northern Ohio's indebtedness to the Lake Erie, at the date of the transfer, is correctly shown by the Lake Erie's books of account, and did not exceed the amount shown thereby.

Under article third of the lease agreement, the Lake Erie obligated itself " to pay yearly and every year during the term hereby granted, by way of rental therefor, all the net earnings, to be determined as hereinafter provided, derived from the operation of the demised railroad, rolling stock, equipment and property, and in any event and though such net earnings may not be sufficient there-

for: (a) all taxes that may be imposed  \*  \*  \*  upon the lessor or upon the said demised premises and property  \*  \*  \*;  (b) the premiums of insurance upon the buildings, rolling stock and equipment demised; (c) such sum, not exceeding one thousand dollars per annum, as the lessor shall  \*  \*  \*  certify to be requisite for the maintenance of its corporate organization  \*  \*  \*;  (d) the coupons maturing upon all the first mortgage bonds of the lessor  \*  \*  \*."
Under article sixth, it is provided that:

> In estimating the net earnings which shall be payable under the terms of this lease by way of rental for the demised premises, there shall be deducted from the gross earnings all fixed charges, all operating expenses, including taxes and expenses of administration, all sums which in the judgment of the lessee shall be necessary to be expended for betterments and additions and the maintenance as a first class railroad of the demised railroad, all sums which shall be necessary fully to equip the demised railroad with sufficient and satisfactory rolling stock and equipment to enable it to transact such business as may be done over it.  \*  \*  \*  In case in any year the net earnings of the demised railroad and property, as hereinabove determined, shall not be sufficient to meet the fixed charges and operating expenses, the lessee shall, notwithstanding, make the payments hereinabove in subdivision (d) of the third article hereof provided, but any amount paid by the lessee in excess of the net earnings for such year shall be deemed an advance on the part of the lessee to the lessor.

From this it would appear that all sums expended by the Lake Erie, in excess of the revenues derived from the operation of the leased properties, were intended by the parties to be advances by the Lake Erie to the Northern Ohio. The Lake Erie was to pay all of the operating expenses of the leased properties, taxes, insurance premiums, $1,000 to maintain the lessor's corporate organization, and interest coupons maturing on the lessor's bonds; all such payments were to be made out of the revenues derived from the operation of the leased properties, and in case the revenues were not sufficient for the purpose, the Lake Erie was to make up the deficiency out of its own funds; any surplus revenues, after all payments with which the Lake Erie was charged were made, were to be paid over to the Northern Ohio as rentals; and any payments made by the Lake Erie, in excess of revenues, were to be deemed advances by the Lake Erie to the Northern Ohio. But the respondent says that, since the lease contains no provision " for the repayment of any of such so-called 'advances' by the lessor to the lessee at the expiration of the term of the lease or prior termination thereof," it must have been contemplated by the parties that such advances should " be deducted from subsequent earnings derived from the operation of the properties before any of such earnings are paid to the lessor," such earnings being the Northern Ohio's only source of income, and if they were so deductible, they were advance rentals. It is true that the

lease contains no provision as to how these advances shall be repaid by the Northern Ohio; but the important thing is that they were to be repaid, and the method of reimbursement is of little or no consequence, and could not serve to change their character into rentals. The respondent's position implies that there was no obligation to repay the advances in the event the rentals accruing to it under the lease were not sufficient to permit such repayment. The implication is unfounded. The lease unmistakably places such advances in the category of loans, and contains no provision which would enable the Northern Ohio to escape repayment in the circumstance of insufficient future income; and the Northern Ohio has always recognized this in its accounting for these advances.

The respondent further contends that the entire indebtedness of the Northern Ohio to the Lake Erie became worthless and uncollectible before 1920, and may not properly be included in the cost basis for determining the deductible loss from the transaction with the Akron Company. If in a prior year the indebtedness of the Northern Ohio was ascertained by the Lake Erie to be worthless, the statute will not permit its deduction in 1920, notwithstanding the disposition in the latter year for a consideration having no determinable monetary value. The statute requires that the deduction be made in the year in which worthlessness and uncollectibility were ascertained, and failure to make the deduction then does not justify the deduction later.

It should be borne in mind that of the total cost of $2,500,000 claimed for the Northern Ohio's indebtedness, $2,444,000 represents the Lake Erie's advances prior to March 1, 1913, and approximately $56,000 after that date. Was this indebtedness good and collectible up to the date the Lake Erie assigned it to the Akron Company? Or was it ascertained to be worthless in a prior year? The burden rested upon the petitioner to furnish such evidence as would justify an affirmative answer to the first question, and, thereby, to establish its right to have the cost of the indebtedness determined as it contends it should be. In that it has clearly failed. Such evidence as there is tends to show that the Northern Ohio's indebtedness became worthless and uncollectible prior to the taxable year.

Every year of operation of the leased property by the Lake Erie resulted in a deficit. In not a single year were the revenues derived from such operations sufficient to meet the expenditures required to be made by the Lake Erie. The following statement shows the net cash outlay by the Lake Erie to meet the deficits from operation of the leased properties and fixed charges of the Northern Ohio; that is to say, the amount which the Lake Erie, under the terms of the lease, was required to expend each year, in excess of the revenues derived from operation of the property:

| | | | | | |
|---|---|---|---|---|---|
| 1896 | $125,000.00 | 1904 | $166,654.35 | 1912 | $156,823.29 |
| 1897 | 125,000.00 | 1905 | 133,422.29 | 1913 | 159,082.43 |
| 1898 | 125,000.00 | 1906 | 115,274.33 | 1914 | 180,050.30 |
| 1899 | 105,000.00 | 1907 | 150,738.98 | 1915 | 166,016.88 |
| 1900 | 100,000.00 | 1908 | 171,994.80 | 1916 | 117,948.94 |
| 1901 | 125,000.00 | 1909 | 159,450.09 | 1917 | 214,470.99 |
| 1902 | 97,840.76 | 1910 | 191,933.63 | 1918 | 140,185.59 |
| 1903 | 151,012.13 | 1911 | 172,896.84 | 1919 | 206,416.97 |

The balance sheets of the Northern Ohio indicate that it owned no property of an income-producing character, other than its leased railroad. Any indebtedness which it incurred could only be paid out of the net revenues derived from the operation of its railroad by the Lake Erie, or out of an increase in its capital structure or funded indebtedness. As already shown, the operating revenues of its railroad were insufficient to meet current obligations; and there is little likelihood that additional funds could have been obtained by an issuance of additional securities, considering the circumstance of failure to earn any return on the existing investment and the absence of earnings out of which to make sinking-fund provisions for the retirement of an additional issue of bonds at maturity, to say nothing of the inadequacy of the earnings to meet the increased interest charge which would result from any increase in indebtedness.

As early as February 4, 1899, the board of directors of the Lake Erie was made aware of the serious financial aspects of operation under the Northern Ohio lease. At a meeting of the board, held on that date, the then chairman reported, with reference to the company's "indirect" obligations, "that the Northern Ohio Railway, which has been and is likely to remain a serious drain upon the earnings of the company, was so owned by it, and held under such circumstances, that there was no hope of getting rid of it." There is not a note of faith, hope or optimism in that statement, and there was nothing to justify any expectation of the ultimate satisfaction by the Northern Ohio of its obligations under the lease.

The Northern Ohio's balance sheet, as of March 1, 1913, shows total assets of $6,811,835.75, which includes investment in road and equipment of $6,746,737.42, and shows an unmatured funded debt of $2,500,000. At the hearing, the petitioner introduced a great volume of evidence to show that the fair market value of the road and equipment, as of March 1, 1913, was $4,100,000. In its brief, it contends for that value. Assuming this as the fair market value of the road and equipment, as of March 1, 1913 (which we need not and do not decide), the total value of the Northern Ohio's assets on that date did not exceed $4,165,098.33, and the value of the Northern Ohio's equity in those assets, over and above the unmatured funded debt, was not more than $1,665,098.33. The total advances

by the Lake Erie to the Northern Ohio, on the same date, amounted to more than $2,444,000. In the transaction with the Akron Company, on March 1, 1920, it disposed of the lease, all of the Northern Ohio's common stock, and the Northern Ohio's indebtedness, for a consideration that had no demonstrable monetary value. That transaction sets at rest any doubt as to the worthlessness of the indebtedness on the date it was disposed of.

From all of these considerations, it is clear that there is no foundation for the deduction which the petitioner claims. The Lake Erie in 1920 disposed of a burden, the original cost of which in 1895 was merely a future undertaking and under the revenue act must be treated as zero. This figure being less than any fair market value which could be determined for the stock or the lease as of March 1, 1913, it must under the statute be used as the basis for determining loss incurred in its disposition. Thus there is no justification under the law for attempting to determine a fair market value on March 1, 1913, for either the stock or the lease. The amounts expended by the Lake Erie, aside from those which were so far regarded by itself as other than investment as to be taken as current deductions on its annual tax returns from 1909 on, were either rentals, and thus clearly not cumulative cost of stock and lease, or advances, and thus deductible in the earlier years when ascertained to be worthless and charged off. The Commissioner was, in our opinion, correct in disallowing the deduction of $92,661.33 which the Lake Erie continued to carry on its books as if it were an asset, and further, we are of opinion that the additional claim now urged for a deduction of $1,500,000 or any other sum as such a loss is not supported by the evidence.

## II.

The second point urged by the petitioner is that the respondent has erroneously disallowed an amount of $459,356.19 of its deduction for maintenance of way and structures and of equipment during the period of the last ten months of 1920, which immediately followed the period of Federal control. This amount is part of the petitioner's actual expenditure for the period accounted for as maintenance, but the disallowance is based on the respondent's determination that to this extent the petitioner's ostensible maintenance cost was really not its own, but a burden assumed by the Director General, the liability for which accrued during the ten-month period and was subsequently discharged by payment in 1924 at the time of final settlement under the Federal control contract. It is alleged in the petition and admitted in the answer that the Director General failed in his contractual duty to maintain the petitioner's property ade-

quately during Federal control. This has come to be known as "undermaintenance," and for it the Director General assumed liability under the contract. The carrier and the Director General were in dispute after Federal control as to their several obligations, and after extended negotiations they agreed upon a lump-sum settlement whereby the Director General in 1924 paid the carrier $700,000. As shown in the list of settlements attached as Exhibit 14 to the Director General's report to the President (Exhibit 57, p. 88, item 181), the carrier first claimed $1,526,437.88 which was raised to a final claim of $3,438,525, while the Director General's tentative set-up was a claim against the carrier of $222,015.24. Notwithstanding that there were numerous items to be adjusted as to which there were detailed and specific consideration and, in some respects, widely varying differences of contention, the final settlement was expressly agreed to be a hotchpot, the Director General refusing to recognize any allocation of the lump sum to the several items in controversy. In his annual report to the President for 1924 (Exhibit 57), the Director General discussed fully the nature and extent of the difficulties inherent in the settlements with contract carriers generally, including the Lake Erie, stating that in all cases the settlements were made in lump sum and that no carrier was advised of any specific recognition or allowance for a particular item of claim. A large part of the Director General's report is devoted to the discussion of the problem of maintenance, and the following excerpts throw light on the background of the allowance for undermaintenance here in question.

[At page 6.] These claims, because of their unique character and large amount, present the most interesting feature of this liquidation. The large items in each claim and the items which were the principal cause of dispute and acute differences of opinion were the demands for compensation for the use of the property, maintenance of way and structures, maintenance of equipment, materials and supplies, and, of lesser controversial importance, the items of depreciation and retirements.

It should be understood that final settlements were based on the accounts as prepared and set up made by the Government and not upon the claims presented by the carriers. The final adjustments were made in " lump sums," in accordance with the Railroad Administration's theory of liability, adjusted to meet such meritorious modifications as resulted from the final hearing.

In no instance was the carrier advised as to the specific allowances made upon particular items claimed, except in the case of non-contract roads, where it was necessary under the law to certify to the Interstate Commerce Commission the amount of compensation finally agreed upon.

[Page 9.] A physical comparison of the property [at the beginning and end of federal control] was impossible, not only because of the constant and daily changes going on in the physical condition of a busy railroad in active operation, but for the further reason that there was no satisfactory record of the condition of the properties as between January 1, 1918, and March 1, 1920, that could be the basis of a physical comparison.

The equation factor and the carriers' demand for its modification so as to reflect the " efficiency of labor " are discussed as follows:

[Page 10.] In fixing the amount due the carriers during the six months' guaranty period immediately following Federal control, the Interstate Commerce Commission, under the provisions of section 209 of the transportation act, was required to apply the rules set forth in the proviso in paragraph (a) of section 5 of the standard contract between the United States and the carriers, and it, therefore, became necessary for the commission to construe this portion of the standard contract. Protracted hearings were had before the commission, in which the Railroad Administration and the carriers were represented.

As a result of these hearings, much difference of opinion developed among the several members of the commission. At first a majority was in favor of the contention of the carriers, making claim in different ways for inefficiency of labor, but a final opinion was rendered July 12, 1921, under the head of " Maintenance expenses under section 209 " (70 I. C. C. Reports 115), in which a majority of the members approved the construction which the Railroad Administration had adopted and contended for, and this rule of construction was consistently applied by the Railroad Administration in all final settlements made with the carriers.

The importance of this question will be appreciated when it is considered that claims aggregating several hundred million dollars might have been created and presented for the period of Federal control and the guaranty period, based upon alleged inefficiency of labor, these claims appearing in many forms, founded upon widely different formulas.

The final rule adopted by the Railroad Administration in making these settlements and in recognizing the liability of the government in the matter of maintenance, was to " match " the expenditures of the carriers made during the pro rata time of the test period corresponding with the period of Federal control, making due allowance for any difference that existed between the cost (price) of labor and materials, taking into consideration any difference in the amount of property taken over as between Federal control and the test period, and any difference in use substantial enough to be considered, these expenditures to be subject to a fair distribution, as provided for in paragraph (a) of section 5 of the standard contract. I believe this rule, followed as consistently as was humanly possible in all adjustments, making in exceptional cases, when the accounting method resulted in grossly unjust conclusions, equitable modifications, came as near as practicable doing substantial justice between the parties.

As to the general problem of measuring maintenance, is the following:

[Page 17.] The general situation as to maintenance must always be borne in mind. The exigencies of the war required, in the taking over of this vast property, arbitrary action on the part of the Government, without any sort of examination or record as to the physical condition of the property at the time it was taken over. There was no general or special survey made that could be the basis of intelligent physical comparison at some future time. Except in a most general way, the physical condition of the roadway, structures, and equipment of the railroads on January 1, 1918, was unknown, and the conditions could be established only by the opinion largely of interested persons.

[Page 18.] Therefore, in the particular items of excess maintenance now under consideration, as well as the general subject of maintenance, the representatives of the Government were always confronted with complicated propositions, absolutely incapable of definite or mathematical solution, and depending largely upon the exercise of an honest and intelligent discretion and judgment.

[Page 20.] Early in the progress of this adjustment it became quite definitely apparent, if the carriers, except in very exceptional cases which clearly justified the charges, should insist upon substantial allowances on their claims for undermaintenance, and the Government insisted upon collection of its excess expenditures for maintenance, under par. b of sec. 5 of the standard contract, no amicable adjustments to any appreciable extent would be made and litigation of a most protracted, uncertain, and expensive character would result. Such litigation would require an analysis of involved railroad accounting, the merits of which would be extremely difficult to present by competent evidence to a court inexperienced, as the ordinary court is, in the science of railroad maintenance and accounting.

The significance of the tentative set-up by the Director General of his claims against the carrier is stated as follows:

[Page 34.] This tentative set-up of Railroad Administration accounts, prepared for the information of the Director General and his staff in making final settlements, was created under the following conditions;

It shows the net maximum amount of all claims of the Railroad Administration against the carriers, including the result of the maintenance studies in the matter of excess expenditures for maintenance, * * * and other charges and claims which it seemed proper to consider in final settlement. In preparing this set-up there were minimum allowances made the carriers on their claims for compensation, * * * and undermaintenance.

In the preparation of the set-ups all reasonable doubts as to validity of claims and amounts were resolved in favor of the Government and against the carriers, minimum amounts in favor of the carriers and maximum charges against them being the rule. This situation naturally resulted after full hearing on the merits in modifications where the facts justified it in the items of these set-ups.

[Page 35.] As has been heretofore fully explained, these excess maintenance expenditures, other than in exceptional cases, were not claims that could be strictly enforced as legal liabilities against the carriers, but were set up as necessary information for use in final settlements, and were effectively used in the disposition of claims presented by the carriers which the Railroad Administration refused to recognize or allow.

This part of his report closes with the statement as to the final settlements:

[Page 35.] Every change made in this account was the result of investigation and discussion, each separate adjustment being made after full hearing on the merits of the particular claim.

It is evident both from the Director General's report and from the testimony before us that there was a protracted controversy in respect of the contractual obligation for maintenance and that the settlement was an adjustment of widely differing claims and contentions. While the petitioner's officers urge their opinion that no allowance for undermaintenance can be recognized in the face of the

Director General's claim for excess maintenance, such an opinion is at variance with the statements in the Director General's report that this was but a tentative set-up surrounded by doubt and was never definitively insisted upon or recognized.

When the settlement was made, separate and independent accounting entries were made by each on its own books for the $459,-356.19, the carrier expressly explaining it as an allowance for under-maintenance and the Director General charging it to his deferred maintenance account, with the allocation of $140,000 to road and $319,356.19 to equipment.

Thus the respondent adopted the designation of the amount as undermaintenance and, treating it as accrued in the period immediately following Federal control, applied it against petitioner's maintenance deduction, and determined the resulting deficiency. The petitioner had likewise recognized the amount as undermaintenance and applicable against its maintenance deduction, but in the year 1924 when it was received. With the determination of the present deficiency, however, the petitioner adopted the view now urged that it is not properly applicable against the maintenance deduction of either year, filed its present petition and also filed with the Commissioner a claim for refund of the alleged overpayment for 1924.

While it is not disputed that the amount (independent of its label or allocation) accrued to petitioner in 1920 and was actually received in 1924, the respondent has not treated it as an item of gross income for 1920, and the case here is clear of such question. The issue is made wholly within the field of deductions. Generally speaking, carrier maintenance charges are among ordinary and necessary expenses (sec. 234(a)(1)), losses (234(a)(4)) and depreciation (234(a)(7)). Permanent improvements, betterments, and restoration of previously deducted depreciation are not deductible (sec. 235), nor are expenses, losses or depreciation the financial burden of which is borne by another, *Terminal R. R. Assn. of St. Louis*, 17 B. T. A. 1135; 61 Fed. (2d) 166; *Kansas City Southern Ry. Co.*, 22 B. T. A. 949; *International-Great Northern R. R. Co.*, 24 B. T. A. 726.

The petitioner has, by fulsome and detailed testimony of its own attitude and demands and those of the Railroad Administration during the extended negotiations for settlement of the obligations under the contract, sought to prove that no part of the settlement payment was intended to cover undermaintenance or was in recognition of undermaintenance, and that, despite both parties' accounting characterizations of the amount as undermaintenance or deferred maintenance, it was really an adjustment of nonmaintenance items, at least to some extent. The contention is that since there was but a lump-sum settlement made after full discussion of many items,

petitioner has the right to break down the ultimate figure according to its own choice, and that such allocation must be recognized as fact by the Commissioner. That the petitioner has the right to choose its own accounting in this respect, within the scope of the Interstate Commerce Commission's supervision, can not be gainsaid by the Commissioner or by the Board; but it is equally clear that no accounting adopted by the petitioner has a sanction greater than the Commissioner's duty to determine its taxable income in accordance with effective revenue law. What a carrier may do in its accounting classification as a private industry or even as a regulated interstate carrier is apart from its subservience as a taxpayer to the requirements of the revenue law. *Old Colony R. R. Co.* v. *Commissioner*, 284 U. S. 552. Therefore in this proceeding the significance of the amount in question is not determinable by reference to the views of the petitioner's own officers as to a convenient or satisfactory accounting for the item or their interpretation of the settlement or its component factors, nor with reference to the conversations with the Railroad Administration during the course of the negotiation as to the extent of the controversy. The last were swallowed up in the final lump-sum settlement, and the former are important only in so far as they are supported by substantive evidence.

Since the Director General has officially said that the settlement represented no specific allowances, and since it is by the pleadings stipulated here that there was undermaintenance during Federal control, and both parties to the settlement having at that time independently appropriated the amount of $459,356.19 to this account, there is ample justification for the respondent's reliance upon this as a *prima facie* designation of the item as a basis for his determination. In this respect, *Terminal R. R. Assn. of St. Louis* v. *Commissioner, supra,* is distinguishable. To overcome this determination, it is not sufficient to urge merely an interpretation of the lump-sum settlement which would exclude undermaintenance in the light of a tangled history of its negotiation. If, however, such interpretation by petitioner's officers were a determinant, its weight would still be impaired by the apparent concession of the petitioner in its fourth assignment of error that some portion of the payment applied to depreciation, destruction, undermaintenance, and damage of the Lake Erie's property during Federal control, and also by the testimony of its engineering assistant purporting to show that among the specified items settled were several in substantial amount relating to undermaintenance.

The petitioner argues that this issue is unlike those in previous cases decided by the Board holding that a carrier's deductions for maintenance are not allowable in so far as amounts were received

from the Director General for undermaintenance during Federal control. The distinction thus urged is attempted to be supported by the petitioner's interpretation of the settlement founded upon its officer's statement of the trend of discussion during the negotiations. Specifically, it is said that the earlier cases involved computations of settlement based upon the Director General's formula without departure or variation, whereas here there was an adjustment of the result of the formula, which adjustment was the principal matter of negotiation. It is not clear from petitioner's argument why this should distinguish the cases or indicate that petitioner was not reimbursed for undermaintenance. Nor can it be held, as urged, that because the Director General once set up a claim for over-maintenance of $36,000 instead of undermaintenance, or discussed figures aggregating $140,000 as applied to certain items, which is the same figure as was later allocated to maintenance of road, or because the $319,356.19 exactly fits as a remainder into the round figure of $700,000, there is no basis for what the petitioner calls the " reimbursement rule " in the earlier decisions.

The petitioner also contends briefly that the amount in question may not be disallowed since it represents compensation for property taken by Federal requisition, and that, if it was expended as respondent holds, the situation is within section 234(a)(14). It has been held, however, by the Board that undermaintenance during Federal control and the allowance therefor is not within the contemplation of the statute as an involuntary conversion of property, *Terminal R. R. Assn. of St. Louis*, 17 B. T. A. 1135, and this was unaffected by the opinion on review.

The petitioner, however, does not rest upon the foregoing contention alone, but urges that, even if the amount be regarded as an allowance for undermaintenance and within the field of the so-called reimbursement rule, " still the respondent's action was erroneous, because the Lake Erie's 1920 maintenance deductions included nothing for replacement or restoration of capital assets, destroyed during Federal control, for which it was reimbursed by the Director General's allowance." Upon this proposition was predicated the introduction of elaborate statistical studies and opinion testimony to show that the petitioner's maintenance expenditures during the last ten months of 1920 were no more than can properly be attributed to the current maintenance requirements of that period, and to show further that, since there was undermaintenance during Federal control, and a proper comparison of maintenance during the two periods shows no greater maintenance in 1920, there was likewise undermaintenance for 1920 and hence no making good of the undermaintenance of the control period. The logic of this argument seems to

assume that the disallowance of the deduction can only be based on the actual use of the $459,356.19 in 1920 to make good such undermaintenance, and that if it can be shown that it was not so used the error of the disallowance of the deduction is established. The soundness of this theory is not discussed and no authority is cited for it. Petitioner proceeds as if the compensation for undermaintenance were a rehabilitation fund impinging upon the computation of its taxable net income only if and when it is actually used to restore or replace the property which suffered by the undermaintenance, and that this can, as to any year, be disproved by a statistical demonstration, including equated comparisons of labor and material, that the expenditure for maintenance is no more than an assumed normal current outlay.

Leaving aside for the moment the practical difficulties in such a view—difficulties no less than those encountered by the Director General and the Interstate Commerce Commission in the settlement under the Federal control contract and under the guaranty provision of section 209 of the transportation act—it is at least doubtful whether the revenue act is to be so construed as to contemplate the annual recurrence of such an issue until a year may be found in which the statistical studies yield a resulting figure of maintenance above an adopted norm. It is also more than doubtful that, regardless of administrative difficulties in ascertaining the facts, the theory is consistent with the annual determination of income. It is not necessary to earmark the carrier's costs of 1920 as those which supply the very maintenance which the Director General should have supplied during Federal control in order to say that the settlement allowance served to reduce the maintenance cost of the accrual period. The significant fact is that in the same period the carrier incurred a given amount of maintenance expense while a smaller amount of maintenance allowance accrued to it from another, thus reducing its financial burden of maintenance *pro tanto*. In other words, while the carrier may not, in view of section 235 of the statute, take as deduction an amount spent for replacement of capital assets if the evidence shows the expenditure to be such, a disallowance of such deduction may also be proper if, although the outlay is for current maintenance, it is made out of amounts contributed by another and is therefore not its own burden. It would seem clear that an amount received under such circumstances by a taxpayer on an accrual basis of accounting must have its effect upon taxable net income of the accrual period, either on the side of gross receipts or by way of an offset to accrued outlay. Certainly it must be reflected in the income of some period, which to the petitioner at first appeared to be the period of receipt, 1924. If it be removed from the determina-

tion for 1920, it is hard to see upon what considerations it should be given place in the computation of another year.

The respondent, however, challenges the petitioner's evidence on its own grounds. He argues that, even if the deduction were proper in the event that no prior undermaintenance was made good in the last ten months of 1920, yet the evidence fails to show this, but does show an undue maintenance expenditure for the period, the excess of which is greater than $459,356.19, and thus upon petitioner's own theory the disallowance is justified.

That the petitioner, in attempting to show that in fact its maintenance performance for the last ten months of 1920 includes no restoration of the Director General's undermaintenance, has undertaken a difficult task must be conceded. It would obviously be practically impossible to establish by direct, primary evidence of knowledge and observation that the actual maintenance of the last ten months of 1920 was not in any respect that which properly should have been applied in the control period. This difficulty was recognized by the Interstate Commerce Commission, 70 I. C. C. 115. The petitioner has adopted, instead, an analytical, circumstantial method whereby it seeks to demonstrate that respondent's determination is unreasonable and entirely inconsistent with a logical interpretation of the figures.

It first compares the man-hours of shop labor applied to locomotive and car repairs for an average ten-month period during Federal control with the man-hours so applied during the last ten months of 1920, and, finding a lower figure in the later than in the earlier period, infers that the equipment maintenance was no greater than in Federal control; and hence, if, as agreed, there was undermaintenance in Federal control, there must have been undermaintenance in 1920, which, it says, is inconsistent with rehabilitation. As to locomotives, it shows that the pounds of locomotives under repair were less than during an average ten months during Federal control, and this, it says, also indicates an absence of rehabilitation to overcome prior undermaintenance. It says that the number of its own cars which were at home and not on foreign lines was greater on December 31, 1920, than on March 1, 1920, and that this supports an inference that undermaintenance was as great in 1920 as in Federal control, or at least that prior maintenance had not been made good in that period, because a carrier's cars are usually in serviceable condition while on foreign lines, while its bad order cars are usually on its own line in or awaiting shop. It shows, as to maintenance of way, that it is principally composed of ties, rails and wooden bridges or trestles, and that the measure of these applied in the last ten months of 1920 was less than in an average ten months of Federal

control; which, it says, supports its inference of undermaintenance as great as in Federal control and hence no rehabilitation. It offers the opinion of its assistant chief engineer that the road's condition was no better on December 31, 1920, than on December 31, 1919, and no better on March 1, 1921, than on March 1, 1920, these being, in his opinion, the only comparable dates having seasonal similarity. Furthermore, it says that there was a shortage of both labor and material in its territory in 1920, and that it had insufficient working capital, from which, although the point is not stated, we assume that the inference is drawn that no rehabilitation could be carried on.

Changing its approach, the petitioner then offers a comparison of test period or pre-control maintenance with that of the last ten months of 1920, showing by means of a system of equation that its gross material charges of the latter period were relatively less than during the test period, and its net material charges only negligibly more. Upon this it urges the conclusion that the respondent is in error in holding that $459,356.19 of the Director General's settlement was actually used to effect a restoration of the undermaintenance during Federal control.

The idea that underlies the first part of the foregoing outline of petitioner's argument is in our opinion without force, because it assumes an unproven hypothesis, namely that the undermaintenance recognized by the Director General as to the control period was the same sort of thing measurable by the same factors as that now sought to be established by the petitioner for the subsequent ten months. It has heretofore been shown that the Director General's undermaintenance was undefined, and, other than the fact that it represented part of his contractual liability, there is nothing to indicate a basis for comparison between it and the maintenance of other periods. The factor of its liability under the contract was a comparison of charges and expenses for labor and materials in the control period with those of the test period properly adjusted. By negotiated settlement the control allowance was arrived at without an agreement or announcement as to the formula for its computation. There is therefore no index of comparison. Thus man-hours of shop labor on equipment, or weight of repaired locomotives, or number of ties, weight of rail, or length of trestles may be less, and yet effectual maintenance of condition and function may be as great; or, indeed, such figures may have been rejected or disregarded in determining what, for purposes of contract settlement, was denominated undermaintenance. The word was quite apparently not used with such definiteness of meaning as to furnish the fulcrum of comparison. Therefore, no matter what such figures for the two periods may show

for other purposes, they do not demonstrate that there was more or less of what for settlement purposes had been accounted for as under-maintenance as a factor of contractual liability.

As to the comparison of man-hours of shop labor during an average ten months of the control period and the last ten months of 1920, it fails to reflect the factor of difference in conditions during the two periods. The petitioner's superintendent of motive power testified that such figures were, in his opinion, a competent reflection of maintenance of equipment if conditions in the two periods were shown to be the same. Accepting, *arguendo*, this view, it does not appear that the conditions of the two periods were alike. There was heavier operation during the war period of Federal control, and by combining the man-hours applied to locomotive repairs with the weight of such repairs it appears that there were less man-hours per pound of repairs in the period of 1920 than during Federal control, a plain indication of different conditions the nature of which is not disclosed. The comparison is also affected by the fact that the Lake Erie & Western was at that time one of the New York Central lines, and as such was in the car-repair pool of the New York Central System, with the consequent inclusion of other system cars and exclusion of its own cars. Whether this would require a substantial adjustment of the figures either way can not be ascertained from the evidence, and thus the comparison to this extent fails.

The fact that there were fewer Lake Erie & Western cars (272) on its own line in March, 1920, immediately after Federal control. of which 41 were serviceable, than in December, 1920 (738), of which only 12 were serviceable, adds little or nothing to the weight of petitioner's evidence; not only because of itself it is but remotely significant, but also because the monthly figures from March to December vary substantially and indicate that the undermaintenance was to some extent made good within the next month or two, that the disparity between March and December is seasonal, and that the 1920 figures reflect no less than the usual and normal current performance of any year.

The next index used by petitioner is the number of ties, tons of rail, and linear feet of wooden trestles applied in the last ten months of 1920 in comparison with the last ten months of 1918 and 1919, these materials being financially the most important factors of maintenance of way. Except for sidetrack ties, the figures are lower for 1920 than for the average of the two earlier years. Here again, no account is taken of the difference in operating conditions during the compared periods. It is well known that war operation

imposed severe burdens on the railroads, which to some extent ceased with the end of Federal control. That this may have involved abnormally heavy installation of ties and rail and increased repair and renewal of bridges is not only a plausible assumption, but is consistent with a comparison of the same figures for the pre-control test period, conceded by the petitioner to be fairly normal, showing more rail and less ties for the post-control than for the pre-control period.

The average quantity of new and secondhand rail applied to roadway in the test period, excluding the months of January and February, during which only emergency maintenance work was done, was 3,331.2277 tons. Applying to that figure a factor of 1.01743 (Exhibit 73), for difference in amount of property maintained, as between the two periods, the average for the test period, adjusted for the difference mentioned, is 3,389.2910 tons. Applying to the latter figure a factor of 1.03189, for difference in use of property, as between the two periods, the average for the test period, adjusted for differences in amount and use of property maintained, is 3,497.3755 tons. The total quantity of new and secondhand rail applied to roadway in the last ten months of 1920 is 4,037.2503 tons, which is 539.8748 more tons than the adjusted average for the test period. This gives the petitioner the advantage of an adjustment factor for difference in amount of property maintained, as between the two periods, although it is not at all clear from the record that the Lake Erie maintained a roadway of any greater length in the last ten months of 1920 than it did in the test period, exclusive of the Northern Ohio's roadway. The factor is based upon an increased investment in way and structures, for the last ten months of 1920, irrespective of whether the increased investment was in structures or in roadway.

For the test period, new rail represented 44.417 per cent and secondhand rail represented 55.583 per cent, of the total rail applied to roadway; for the last ten months of 1920, new rail represented 47.990 per cent and secondhand rail represented 52.010 per cent of the total rail applied to roadway. Thus, in the last ten months of 1920, 3.573 per cent more new rail and less secondhand rail was applied to roadway than in the test period.

The following statement shows the average percentage of total rail applied to roadway, for an average ten months of the test period, represented by each of the seven grades of rail so applied, the actual percentage of total rail applied in the last ten months of 1920, represented by each of the several grades applied in that period, and the cumulative percentages for both periods:

| Grade | Test period | | Last 10 months, 1920 | |
|---|---|---|---|---|
| | Average | Cumulative | Average | Cumulative |
| 90-pound | 3.263 | 3.263 | 48.165 | 48.165 |
| 80-pound | 44.221 | 47.484 | 2.789 | 50.954 |
| 75-pound | 26.789 | 74.273 | 42.411 | 93.365 |
| 60-pound | 3.138 | 77.411 | .413 | 93.778 |
| 56-pound | 18.734 | 96.145 | 4.580 | 97.358 |
| 52-pound | | 96.145 | .115 | 97.473 |
| Scrap | 3.855 | 100.000 | 1.527 | 100.000 |
| | 100.000 | | 100.000 | |

It would seem that not only more than normal maintenance was accomplished in the last ten months of 1920, as indicated by the excess quantity of rail applied to roadway in that period over the average for ten months of the test period, but that the betterments of roadway made in the first mentioned period were much greater than in an average ten months of the test period, as indicated by the ratios of new to secondhand rail applied and the cumulative percentages of the several grades of rail applied, for the two periods.

The petitioner's assistant chief engineer stated that he had inspected the railroad according to his periodic wont and found it to be in his opinion in no better condition at the end of 1920 than at the beginning. This opinion adds little or no force to the petitioner's contention, for, aside from the fact that this is an opinion of an interested person regarded by the Director General as inadequate for official recognition (Director General's Report to the President, *supra*, p. 17), and not controlling with this Board (*Uncasville Mfg. Co.* v. *Commissioner*, 55 Fed. (2d) 893), the physical appearance of the road in general is not shown to disclose whether $459,000 of the year's maintenance expense had been devoted to such restoration of road as the Director General had failed in his contractual duty to maintain.

The petitioner's next method of demonstrating that the maintenance charges of the last ten months of 1920 do not include restoration of the prior undermaintenance is a comparison with the cost figures of the test period. Although the evidence upon this is extensive and detailed, the findings herein being a substantial condensation to the essential facts, the petitioner's brief of the proposition is contained in two paragraphs, as follows:

The average annual test period maintenance expenses were not only made, by the Federal control contract and by statute, the norm or standard for measuring the maintenance of the Federal control and guaranty periods, but such expenses of the Class I roads of the country as a whole, of those of the Eastern District, and of the Lake Erie alone, were, in fact, not above normal. * * * Consequently, it is entirely fair and proper to use in these proceedings

appropriate test period figures of the Lake Erie as a basis for measuring the amount of maintenance work performed by it during the last 10 months of 1920, although there is no statutory or contractual provision declaring that such test period figures shall constitute norms under the Revenue Act of 1918.

Proper maintenance effects complete physical restoration or reparation. Maintenance accomplished is material in place. Therefore, in comparing, for the purposes of these proceedings, maintenance performed by the Lake Erie in 1920 with that done by it in the test period, the cost ratio or factor for maintenance materials only should be used. Labor price factors, and, consequently, such composite material and labor price factors as were used by the Director General in settling under his formula and the standard Federal control contract, and by the Interstate Commerce Commission in making, in accordance therewith, its guaranty period settlements, should be disregarded, because they do not provide for physical reparation. A factor, representing the ratio of the prices of maintenance materials used in the last 10 months of 1920 to the prices thereof in the test period, arrived at according to the Commission's methods, does fairly and properly provide for physical reparation and, therefore, is to be used here. That factor is about 2.05.

Applying this process, with the use of the factor of 2.05, the actual average test period charge for gross materials (disregarding salvage) becomes an equated figure of $1,577,636.68 in comparison with the 1920 figure of $1,526,242.18, which shows that 1920 maintenance cost was less than the normal test period cost and hence can not include more than current maintenance and necessarily excludes restoration of prior undermaintenance, *quod erat demonstrandum.*

The respondent; demurring generally to the theory of such equation, insists that if an equation is to be recognized it must be that used by the Director General and by the Interstate Commerce Commission and may not exclude the cost of labor or postulate inefficiency of labor; that such an equation factor is 2.35 instead of 2.05; and its use results in the comparison of an equated figure for the test period of $3,296,033.30 (excluding insurance, depreciation and retirements) with a similar figure for 1920 of $4,642,685.92 and the deduction on the income-tax return of $4,214,490.84; either of the latter figures being greater than the equated test period figure by more than the $459,316.19 in controversy, and therefore justifies his disallowance.

Before proceeding to consider the merits of the respective contentions of the parties, it is well to understand the method used by the Commission in determining the amount which was to be included in operating expenses of the guaranty period for maintenance, and the relation of the Commission's determination in that respect, to the issue before us.

Under the provisions of section 5 (a) of the Federal control standard contract between the Lake Erie and the Director General, the latter agreed to maintain, and at the end of Federal control to return, the carrier's property in substantially as good repair and complete equipment as it was in on January 1, 1918. It was provided,

however, that the annual expenditures and charges by the Director General for maintenance, renewal, retirement and .depreciation of property, of an amount equal to the average annual test period expenditures and charges for those purposes, subject to the adjustments provided in paragraph (c), should be taken as a full compliance with the foregoing covenant. Paragraph (c) provided that in comparing the amounts expended and charges under paragraph (a) with the test period expenditures and charges, due allowance should be made for the differences in amount and use of property maintained, and in the cost of labor and materials, as between the Federal control and test periods, " so that the result shall be, as nearly as practicable, the same relative amount, character, and durability of physical reparation."

Upon the termination of Federal control, the Director General issued Accounting Circulars 101 and 109, later amplified and supplemented, which fully set forth the method by which the. amount of maintenance expenses allowable for the Federal control period was to be determined. These Accounting Circulars, with supplements, embody the Director General's interpretation of section 5 of the standard contract. The method provided, among other things, that the factor for equating test period labor costs on the basis of the Federal control period labor costs should be determined by dividing the compensation for hours worked in test period at average rates during Federal control period by total test period compensation. The carriers, including the Lake Erie, objected very strongly to this formula for determining the labor equation factor, arguing to the Director General that, because of its failure to recognize the difference in efficiency of labor as between the Federal control and test periods, the resulting factor would not provide the physical reparation to which they were entitled under section 5 of the standard contract. The Director General refused to change the formula; but, in " meritorious " cases, he made lump-sum allowances upon final settlement.

By section 209 (3) (f) of the Transportation Act, 1920, it was provided that the amount to be included in operating expenses of the guaranty period for maintenance should be fixed by the Interstate Commerce Commission; and that the Commission in fixing such amount should apply, as far as practicable the rule set forth in the proviso in paragraph (a) of the standard contract.

In a formal proceeding at which the Director General, the Association of Railway Executives, and certain carriers were represented, the matter of maintenance expenses of the guaranty period, more particularly the question of the correct interpretation of the phrase " cost of labor " in section 5 of the standard contract, was.considered

by the Commission. Its decision in the matter, "Finance Docket 1176, Maintenance Expenses Under Section 209," is reported at 70 I. C. C. Reports 115. At the hearing, the Director General contended that the phrase meant "only the rates of pay per unit for the recognized varieties of railroad labor," while the carriers contended "that the labor must be related to the accomplishment of a given result, and hence that the words include in their meaning quality as well as wages." The Commission, after extensive discussion and with three dissents, concluded that the words "cost of labor," as used in the standard contract, " do not, we think, open the door to a comparison of the quality or efficiency of labor " and " that differences in the ' cost of labor,' as these words are used in paragraph (c), do not include changes in the quality or effectiveness of labor but only changes in wages."

Following the above decision, the Commission, in "Finance Docket 1606, In The Matter Of Final Settlement Under Section 209," 70 I. C. C. Reports 711, after stating that " the allowances for differences that may exist between the cost of labor and material for the test period and for the guaranty period, respectively, can not practicably be made upon the basis of any rigid rule or formula, but these allowances must be fixed by us in the exercise of a reasonable judgment upon consideration of all the relevant facts and circumstances," announced the following rule:

\* \* \* We therefore announce the following rule for adjustment of differences in cost of labor and material in establishing the amounts which will be fixed by us as amounts which shall not be exceeded in charges to operating expenses for maintenance of way and structures and for maintenance of equipment, for the purposes of the guaranty:

There shall first be deducted from the maintenance expenses of the test period all amounts included therein for (a) depreciation, (b) retirements, and (c) insurance.

The remainder, after being adjusted for differences in amount and use of property maintained, shall be multiplied by a factor representing the increase in the general level of cost of labor and material for the territories in which the lines of railway of the carrier are situated. To the product thus arrived at shall be added back the deductions hereinabove provided for, adjusted for differences in amount and/or use of property maintained. The resulting sum will be the amount to be fixed by us as that which shall not be exceeded in charges to operating expenses for the purposes of the guaranty for the aggregate of maintenance of way and structures and maintenance of equipment. \* \* \*

Carriers, in presenting their claims or statements of amounts due to or from the United States under the guaranty, will be required to state under oath the increase in cost of labor and material for their respective territories and may support these statements by such statistics and representations as may to them appear proper. In the presentation of such cases it should be borne in mind that the fact that certain prices were actually paid for units of labor or units of materials in the test period and the guaranty period, respectively, is not conclusive evidence that those prices indicate or measure increases in cost of labor

or material for which " due allowance shall be made." The prices actually paid in either period may be affected by the relative competence of management, by standards of maintenance adopted, or by other causes not attributable to increased cost of labor or material. What we construe the proviso to mean and what we find to be practicable in a settlement of these matters contemplates a determination of changes in the general levels of cost of labor and material beyond the carrier's control. * * , *

In Finance Docket 1176, *supra*, the Commission said:

We therefore find and conclude that the proviso in paragraph (a) of section 5 of the standard contract sets forth a rule for measuring the compliance of the director general with the covenant of upkeep by reference to the accounts of the carriers, when kept in accordance with our requirements; that the basic measure is the expenditure for maintenance during an average six months of the test period, adjusted to differences in the cost of labor and materials and in the amount and use of the property, in accordance with the provisions of paragraph (c) ; and that differences in the " cost of labor," as these words are used in paragraph (c), do not include changes in the quality or effectiveness of labor but only changes in wages.

The Assistant Director of the Commission's Bureau of Finance, a witness for the petitioner, testified as to the Commission's procedure in finally determining upon a factor of 2.35 for the Lake Erie, as representing the differences in cost of labor and materials, as between the test and guaranty periods. He testified that a composite or general factor for the entire United States was determined by working out the carriers' returns under the Director General's formula; that it was found the general factor was too high for certain territories and too low for other territories; that the country was then divided into regions, not necessarily upon geographical lines, and labor and material factors determined for each region; that the Lake Erie was assigned to the eastern region; that the findings of the Bureau as to the eastern region were the most controversial of all; that because of this, the returns of all of the 49 carriers operating in the eastern region were combined in one composite return, which disclosed an average regional factor of 2.34; that the Commission finally decided upon a regional factor of 2.35, as being a reasonable general factor for the eastern region; that said regional factor of 2.35 was not the highest, nor the lowest, and not exactly an average, but a judgment factor; that it is impossible to state the process of reasoning of all of the different people who participated in the selection of that factor, and, consequently, it is not susceptible of precise division into its component parts, but as nearly as a breakdown is possible, the separate and composite labor and material factors for way, structures and equipment are as set out in the findings; that the factor was varied by the Commission, according to the circumstances which the individual carriers could support with proof; that the Price Board, an organization set up

in the Commission's Bureau of Finance to investigate returns of carriers and make recommendations as to the proper factor in each case, reported, in the case of the Lake Erie, that investigation indicated that a higher labor factor and a lower materials factor, than the regional factors, were justified, but the two considered together indicated that the composite general factor of 2.35 was as nearly right as could be obtained; and that the eastern region factor of 2.35 was finally adopted by the Commission as proper in the case of the Lake Erie.

As the test period has been adopted by Congress and by the Interstate Commerce Commission as a normal period of operation for carriers generally, we may assume this without discussion in respect of the Lake Erie. The equation method of comparison has been approved by the Board in prior cases, and will be applied so far as it is available, *Missouri Pacific R. R. Co.*, 22 B. T. A. 267; *Norfolk Southern R. R. Co.*, 22 B. T. A. 302; *Kansas City Southern Ry. Co.*, 22 B. T. A. 949; *Chicago & Northwestern Ry. Co.*, 22 B. T. A. 1407. The question remains whether the petitioner has properly applied the method and whether its adjusted figures may be taken to reflect a sound comparison.

Although the Interstate Commerce Commission arrived at an equation factor of 2.35 for maintenance by combining both labor and material cost, the petitioner, upon the doctrine that "maintenance accomplished is material in place," insists that maintenance of the two periods should be compared by using only equated material cost and disregarding entirely the cost of labor. The justification for this omission is not that labor is not an element of maintenance or that the labor cost figures do not affect the comparison, but that the labor factor used by the Commission as a component of the general maintenance factor is unsound in that it does not reflect differences in the " efficiency " of labor in the two periods. Thus omitting labor from the equation and using only the Commission's factor of material cost, the factor used is 2.05 instead of 2.35. There are several reasons why this method can not be recognized as sound. After a far more informed study than can be made by this Board in this proceeding, the Interstate Commerce Commission held that the comparative " efficiency " of labor should not be used in determining the equation factor, and that for several reasons Congress had not intended its use as a measure either of compensation for Federal operation or of the guaranteed income of the following six months. If, however, it could be supposed that Congress intended such an issue to be open to fresh consideration by this Board in the case of each carrier disposed to attack the Commission's general determination in respect of its own tax deductions, there is no reason to believe

that such an attack could be supported by less evidence as to this carrier than that which was required by the Commission in respect of carriers generally. In contrast with the data upon which the Interstate Commerce Commission based its consideration as disclosed by its report, *supra*, and by the testimony here, there is but the opinion of petitioner's vice president Colston that the Commission's factor is unsound and that the labor factor disregards difference in efficiency. As to the Lake Erie, there is no data whatever before us from which the comparative efficiency could be found or inferred. So far, indeed, as cost of labor in the two periods was affected by the so-called "national agreement," it would seem that the Lake Erie and other New York Central lines were less affected than some other carriers because a substantial part of the terms of the national agreement had already been effective on that system. Furthermore, it is obvious that even if we were convinced that the labor factor improperly omitted to reflect comparative efficiency, this would not justify the complete exclusion from the maintenance factor of any component for labor. Maintenance without labor is an anomaly. If the general factor of 2.35 were incorrect because of an error in one of its components, it would require correction. A true factor for labor would need to be determined, and this would require evidence, the burden of which would be upon the petitioner, who invokes the comparison and the method. There is, however, not a scintilla here upon which we could base such an adjustment. If, therefore, the 2.35 figure were incorrect, it would result that the entire equation would be incorrect and would necessarily be disregarded. Thus there would be nothing with which to apply the method of equated comparison, and the argument upon the basis of test period figures would fail.

We shall, therefore, treat the general factor of 2.35 used by the Commission as a correct determinant of guaranty period income, and from that point proceed similarly to ascertain the equated comparison of the figures of the test period with the figures of the last ten months of 1920, making the necessary changes from the Commission's determination of the six-month period in order to test the ten-month period.

The Commission determined that one-half of the average annual test period expenditures and charges for maintenance, exclusive of expenditures and charges for depreciation, insurance and retirements of property, amounted to $350,262.31 for way and structures, $205,-772.70 for locomotives, $254,389.87 for freight train cars, $16,938.60 for passenger train cars, and $4,907.52 for work equipment. These figures are not contested and are found in several exhibits in evidence. Therefore, the average expenditures and charges for main-

tenance, exclusive of expenditures and charges for depreciation, insurance and retirements of property, for an average ten months of the test period, are $583,730.52 for way and structures, $342,954.50 for locomotives, $423,983.12 for freight train cars, $28,231 for passenger train cars, and $8,179.20 for work equipment. The Commission also determined that one-half of the average annual test period expenditures and charges for depreciation, insurance and retirements of property amounted to, in the case of way and structures, $615.48 for insurance and $9,269.42 for retirements, and, in the case of equipment, $58,095.68 for depreciation, $196.89 for insurance, and $15,730.56 for retirements. Therefore, the expenditures and charges for depreciation, insurance and retirements of property, for an average ten months of the test period, are, in the case of way and structures, $1,065.80 for insurance and $15,449.03 for retirements, and, in the case of equipment, $96,826.13 for depreciation, $328.15 for insurance, and $26,217.60 for retirements.

The next step requires a determination of the factor representing the differences in cost of labor and materials, as between the test period and the last ten months of 1920. The Commission determined that a proper factor for the guaranty period, which was the first six months of the said ten-month period was 2.35. The Commission's Assistant Director of Finance, to whom reference previously has been made, testified that a proper factor representing the differences in cost of labor and materials, as between the test period and 1921, determined according to the same method by which the Commission determined the factor for the guaranty period, would be 2.29; and that a proper factor for the last four months of 1920 would be between 2.35 and 2.29. He further testified that, as nearly as it was possible to break these two factors down into component factors, the factor of 2.35 represented a material equation factor of 2.04 and a labor equation factor of 2.64, and that the factor of 2.29 represented a material equation factor of 2.10 and a labor equation factor of 2.41. His testimony indicates an increase in the cost of maintenance materials and a decrease in the cost of maintenance labor, as between the guaranty period and 1921; and this is supported by the evidence that there was a shortage of maintenance materials in the Lake Erie's territory in 1920, and that the trend of maintenance materials prices was upward in 1920 and into the following year, while the trend of maintenance labor costs was sharply downward before the close of 1920. The evidence disclosed that the expenditures for materials and the expenditures for labor, in 1920, were in the approximate ratio of 5 to 8, which, if fairly representative of the ratio of 1921 material costs to 1921 labor costs, would corroborate the reduction in the general factor from 2.35 to

2.29. For instance, if the 1921 material equation factor of 2.10 be multiplied by 5, and the 1921 labor equation factor of 2.41 be multiplied by 8, and the sum of the two products be divided by 13, the resulting general factor would be exactly 2.29.

It is clear that some portion of the reduction of .06 in the 1921 general factor, from the guaranty general factor, took place in the last four months of 1920, but the evidence affords no basis for an inference as to just what that portion is. If the reduction be considered as having taken place ratably over the last four months of 1920 and calendar year 1921, sixteen months in all, then the portion of the reduction attributable to the last four months of 1920 would be .015, and a proper general factor, for the said four months, would be 2.335. Giving to the guaranty period general factor of 2.35 and to the general factor for the last four months of 1920 of 2.335, the weights of six and four, respectively, according to the number of months in the periods to which they respectively apply, a general factor of 2.344 is indicated for the last ten months of 1920. Since this factor is so close to the guaranty period general factor of 2.35, we may adopt the latter as applicable to the entire last ten months of 1920.

The next step requires a determination of the factors representing the differences in the amounts of the properties maintained, as between the test period and the last ten months of 1920. This requires the determination of separate factors for way and structures and for the four classes of equipment—locomotives, freight train cars, passenger train cars, and work equipment. In Exhibit 73, the petitioner has computed these factors according to the methods used by the Interstate Commerce Commission in determining like factors for the guaranty period, except in the case of work equipment, for which the petitioner has not computed such a factor and has not submitted proof of the basic facts upon which such a factor could be computed. The methods used by the Commission in computing the factors for the guaranty period are set forth in the findings of facts. Under the circumstances, it appears proper to accept the factors set forth in Exhibit 73.

In the case of way and structures, locomotives, and freight train cars, the amount of property maintained in the last ten months of 1920 was greater than in an average ten months of the test period, and the factors representing the differences are: .01743 for way and structures, .35113 for locomotives, and .28125 for freight train cars. In the case of passenger train cars, the amount of property maintained in the last ten months of 1920 was less than in an average ten months of the test period, and the factor representing the difference is .08281. In the case of work equipment, the Commission allowed

a plus adjustment for the guaranty period of $323.24, for difference in amount of property maintained, as between the test and guaranty periods; and since the amount of the adjustment was determined upon the basic figure of $4,907.52, one-half average annual test period expenditures and charges for maintenance of work equipment, it is apparent that the factor used by the Commission to represent the difference in amount of property maintained was .06587. The petitioner has not proven, or attempted to prove, that the amount of work equipment maintained in the last ten months of 1920 was greater than the amount maintained in the guaranty period; and it can not complain of the use of the Commission's factor for work equipment, .06587.

The next step requires a determination of the factors representing the differences in the use of the properties maintained, as between the test period and the last ten months of 1920. This requires the determination of separate factors for way and structures and for the four classes of equipment—locomotives, freight train cars, passenger train cars, and work equipment. The petitioner has not proven, or attempted to prove, the basic facts upon which such factors could be computed. For the guaranty period, the Commission allowed plus adjustments of $11,357.07 in the case of way and structures, and $166.81 in the case of work equipment; and made minus adjustments of $44,941.69, $6,512.38, and $196.37, in the case of locomotives, freight train cars, and passenger train cars, respectively, for differences in use of property maintained, as between the test and guaranty periods; and since the amounts of these adjustments were determined respectively upon the basic figures of $356,132.71, $5,-230.76, $279,140.96, $325,619.03, and $15,535.93, being, in each instance, one-half of the average annual test period expenditures and charges for maintenance, adjusted for differences in amounts of property maintained, the factors used by the Commission to represent the differences in use of property maintained were apparently .03189 for way and structures, .03189 for work equipment, .16100 for locomotives, .02000 for freight train cars, and .01264 for passenger train cars. As the petitioner has not proved, or attempted to prove, that the use of these facilities in the last ten months of 1920 was greater or less than the use thereof in the guaranty period, the Commission's factors may be treated as applicable to the entire last ten months of 1920.

The following, therefore, is a computation of the equated maintenance expenses of an average ten months of the test period, exclusive of expenditures and charges for depreciation, insurance and retirements of property, adjusted for differences in amount and use of property maintained:

Ten-twelfths of average annual test period expenditures and charges for maintenance of way and structures, exclusive of expenditures and charges for depreciation, insurance and retirements of property_____ $583, 730. 52

Add adjustments for:

  Difference in amount of property maintained_____ 10, 174. 42

  Difference in use of property maintained_____ 18, 939. 63

  Difference in cost of labor and materials_____ 827, 340. 17

Total equated ten-twelfths of average annual test period expenditures and charges for maintenance of way and structures, exclusive of expenditures and charges for depreciation, insurance and retirements of property, adjusted for differences in amount and use of property maintained_____ 1, 440, 184. 74

Ten-twelfths of average annual test period expenditures and charges for maintenance of equipment, exclusive of expenditures and charges for depreciation, insurance and retirements of property:

| | | |
|---|---:|---:|
| Locomotives | $342, 954. 50 | |
| Freight train cars | 423, 983. 12 | |
| Passenger train cars | 28, 231.00 | |
| Work equipment | 8, 179. 20 | |
| | | 803. 347. 82 |

Add adjustments for:

  Differences in amount of property maintained:

| | | |
|---|---:|---:|
| Locomotives | $120, 421. 61 | |
| Freight train cars | 119, 245. 24 | |
| Work equipment | 538. 76 | |
| | | 240, 205. 61 |

  Difference in use of property maintained:

| | | |
|---|---:|---:|
| Work equipment | $278. 02 | |
| | | 278. 02 |

  Differences in cost of labor and materials:

| | | |
|---|---:|---:|
| Locomotives | $524, 842. 96 | |
| Freight train cars | 718, 691. 12 | |
| Passenger train cars | 34, 513. 98 | |
| Work equipment | 12, 144. 57 | |
| | | 1, 290, 192. 63 |

Total additions_____ 2, 334, 024. 08

Deduct adjustments for:

  Differences in amount of property maintained:

| | | |
|---|---:|---:|
| Passenger train cars | $2, 337. 80 | |

  Differences in use of property maintained:

| | | |
|---|---:|---:|
| Locomotives | $74, 603. 55 | |
| Freight train cars | 10, 864. 57 | |
| Passenger train cars | 327. 29 | |
| | | 85, 795. 41 |

Total deductions_____ 88, 133. 21

Total equated ten-twelfths of average annual test period expenditures and charges for maintenance of equipment, exclusive of expenditures and charges for depreciation, insurance and retirements of property, adjusted for differences in amount and use of property maintained_____ 2, 245, 890. 87

Total equated ten-twelfths of average annual test period expenditures and charges for all maintenance, exclusive of expenditures and charges for depreciation, insurance and retirements of property, adjusted for differences in amount and use of property maintained_____ $3, 686, 075. 61

The next step requires the determination of a factor for adjusting equipment depreciation, on account of the differences in amount and use of equipment maintained, as between the test period and the last ten months of 1920. One-half of the average annual test period charge for depreciation of equipment amounts to $58,095.68, but the Commission allowed for the six-month guaranty period the sum of $100,795.02, which is 7.472 per cent of the equated one-half average annual test period expenditures and charges for maintenance of equipment, exclusive of expenditures and charges for depreciation, insurance and retirements, adjusted for differences in amount and use of equipment maintained, as between the test and guaranty periods. The petitioner has not proved, or attempted to prove, the basic facts upon which a proper factor for adjustment of depreciation could be computed, to represent the difference in amount and use of equipment, as between the test period and the last ten months of 1920. The combined adjustments which the Commission allowed for the guaranty period, for differences in amount and use of equipment maintained, represent 19.040 per cent of the one-half average annual test period expenditures and charges for maintenance of equipment, exclusive of expenditures and charges for depreciation, insurance and retirements; while the combined adjustments for the last ten months of 1920, as hereinbefore computed, for the same differences, represent 18.964 per cent of the ten-twelfths average annual test period expenditures and charges for maintenance of equipment, exclusive of expenditures and charges for depreciation, insurance and retirements. The comparison indicates that the combined differences in amount and use of equipment maintained, as between the test and guaranty periods, is greater than the combined differences, as between the test period and the last ten months of 1920; hence, it would appear, in the absence of evidence proving the petitioner's right to any greater adjustment, that a depreciation adjustment, representing the combined differences in amount and use of equipment, as between the test period and the last ten months of 1920, equal to 7.472 per cent of the equated ten-twelfths average annual expenditures and charges for maintenance of equipment, exclusive of expenditures and charges for depreciation, insurance and retirements, adjusted for differences in amount and use of property maintained, would not be less than fair to the petitioner. Such an adjustment amounts to $70,986.84; and, accordingly, the ten-twelfths aver-

age annual test period charge for depreciation of equipment, adjusted for differences in amount and use of property maintained, as between the test period and the last ten months of 1920, is $167,812.97.

The factors representing the differences in amount of property maintained, as between the test period and the last ten months of 1920, are .01743 for way and structures, and .29160 for equipment. Ten-twelfths of the average annual test period expenditures and charges for insurance amounts to $1,065.80, in the case of way and structures, and $328.15 in the case of equipment. Therefore, the average expenditures and charges for insurance for ten months of the test period, adjusted for differences in amount of property maintained, are $1,084.38 in the case of way and structures, and $425.32 in the case of equipment.

The factors representing combined differences in amount and use of property maintained, as between the test period and the last ten months of 1920, are .04988 for way and structures, and .18964 for equipment. Ten-twelfths of the average annual test period expenditures and charges for retirements amounts to $15,449.03 in the case of way and structures, and $26,217.60 in the case of equipment. Therefore, the average expenditures and charges for retirements for ten months of the test period, adjusted for differences in amount and use of property maintained, are $17,304.01 in the case of way and structures, and $31,189.51 in the case of equipment.

Accordingly, the total equated ten-twelfths of average annual test period expenditures and charges for all maintenance, adjusted for differences in amount and use of property maintained, is $3,902,807.42, computed as follows:

Total equated ten-twelfths of average annual test period expenditures and charges for all maintenance, exclusive of expenditures and charges for depreciation, insurance and retirements of property, adjusted for differences in amount and use of property maintained, as heretofore computed in this report___ $3,686,075.61

Additions:

Ten-twelfths of average annual test period charge for depreciation of equipment, adjusted for difference in amount and use of property maintained_____ 167,812.97

Ten-twelfths of average annual test period expenditures and charges for insurance, adjusted for differences in amount of property maintained:

Way and structures_____ $1,084.38
Equipment _____ 425.32
                                          ————— 1,509.70

Ten-twelfths of average annual test period charges for retirements of property, adjusted for differences in amount and use of property maintained:

Way and structures_____ $16,219.63
Equipment _____ 31,189.51
                                          ————— 47,409.14

Total equated ten-twelfths of average annual test period expenditures and charges for all maintenance, adjusted for differences in amount and use of property maintained_____ $3,902,807.42

The total expenditures and charges for maintenance charged to operating expenses in the last ten months of 1920, and claimed by the Lake Erie as a deduction in computing taxable net income in its return for 1920, amounts to $4,401,355.90, which is $498,548.48 in excess of the total equated ten-twelfths of average annual test period expenditures and charges for all maintenance, adjusted for differences in amount and use of property maintained.

Thus a full consideration of the merits of petitioner's contention, from the standpoint of its rational theory and from the standpoint of an analysis of the facts brought forward to support it, leads to the opinion that the respondent properly disallowed from the 1920 deductions for maintenance the amount of $459,356.19, and the determination in this respect is sustained.

It is contended by the petitioner that the respondent erred:

In not allowing as a deduction from the Lake Erie's gross income a loss of not less than $1,500,000, sustained by the Lake Erie during the taxable year and not compensated for by insurance or otherwise, which losses resulted from the depreciation, destruction and undermaintenance of and damage to the Lake Erie's property (including the Fort Wayne, Cincinnati and Louisville Railroad and the Northern Ohio Railway) while under federal control.

In brief, the petitioner contends that such loss was $2,103,621.84, and that the Lake Erie was only compensated therefor by the Director General to the extent of less than $459,356.19. The petitioner computes the total loss of the Lake Erie as follows:

| | | |
|---|---:|---:|
| Amount necessary to restore equipment wholly or partially consumed during Federal control: | | |
| Lake Erie_____ | $1,465,496.72 | |
| Northern Ohio_____ | 26,092.08 | |
| | | $1,491,588.80 |
| Road property retired and not replaced—normal: | | |
| Lake Erie_____ | $148,810.26 | |
| Northern Ohio_____ | 12,058.42 | |
| | | 98,902.85 |
| Loss on gravel sold, Lake Erie only_____ | | 4,385.62 |
| Material purchased under hold-over contracts, Lake Erie only___ | | 67,248.63 |
| Losses on additions and betterments: | | |
| Lake Erie _____ | $148,810.26 | |
| Northern Ohio _____ | 12,058.42 | |
| | | 160,868.68 |
| Loss on ties, both Lake Erie and Northern Ohio, not possible of allocation as between the two_____ | | 273,294.45 |
| Transportation on deficit material, both Lake Erie and Northern Ohio, not possible of allocation as between the two_____ | | 7,332.81 |
| Total loss_____ | | 2,093,621.84 |

The petitioner further contends that of the Director General's allowance of $459,356.19, for disputed items in the Lake Erie's claim for settlement of Federal control, about $50,000 " clearly was not for any of the foregoing losses," *Issue II, supra,* but that " the remainder of it undoubtedly was." The amount of the alleged total loss, less the net amount of the Director General's allowance alleged to be applicable thereto, is greater than the loss alleged to have been sustained by the Lake Erie, in the assignment of error.

The respondent defends upon the grounds, that whatever loss, if any, was sustained was deductible in 1924, the year in which final settlement for Federal control of the Lake Erie was made with the Director General, and not in 1920, *Chicago & North Western Ry. Co.,* 22 B. T. A. 1407; and that the evidence does not show that the Lake Erie sustained a deductible loss, arising out of Federal control and operation of its properties, at any time.

All of the items embraced in the claimed loss deduction were the subject of claims made by the Lake Erie against the Director General, although the amounts may have been different.

In *Chicago & North Western Ry. Co., supra,* identically the same question was presented, and in disposing of it, in accordance with the respondent's first ground of defense in this case, the Board said:

The second question for our consideration is whether the petitioner sustained a deductible loss from gross income in 1920 by reason of the return to it on March 1, 1920, of its railroad properties in a seriously undermaintained condition. The petitioner contends that the amount of this loss is approximately $25,000,000, or, more accurately, the difference between its claim for undermaintenance, filed with the Director General in 1920, of $34,918,823.30 and the $8,191,905.37 allowed in the lump-sum settlement of 1921, or $26,726,917.93.

The provision of law invoked in making this contention is section 234 (a) (4) of the Revenue Act of 1918, which permits a corporate taxpayer to deduct from gross income " Losses sustained during the taxable year and not compensated for by insurance or otherwise." This provision of law was under consideration by the Supreme Court in *United States* v. *White Dental Mfg. Co.,* 274 U. S. 398, in which the court stated:

The case turns upon the question whether the loss, concededly sustained by the respondent through the seizure of the assets of the German company, in 1918, was so evidenced by a closed transaction within the meaning of the quoted statute and treasury regulations as to authorize its deduction from gross income of that year. The statute obviously does not contemplate and the regulations (Art. 144) forbid the deduction of losses resulting from the mere fluctuation in value of property owned by the taxpayer. * * * But with equal certainty they do contemplate the deduction from gross income of losses, which are fixed by identifiable events, such as sale of property (Art. 141, 144), or caused by its destruction or physical injury (Art. 141, 142, 143) or, in the case of debts, by the occurrence of such events as prevent their collection (Art. 151).

Assuming that the petitioner's properties were undermaintained during the period of Federal control to the extent contended for by the petitioner and that the undermaintenance was not made good in the lump-sum settlement to the amount of $26,726,917.93, what was the "identifiable event" of 1920 that fixed the loss as one sustained in that year? The petitioner contends that it was the return of the properties by the Director General to it in that year. But the fact is that under its contract with the Director General of Railroads of September 10, 1918, it was provided:

> SEC. 5. (a) During the period of Federal control the Director General shall, annually, as nearly as practicable, expend and charge to railway operating expenses, either in payments for labor and materials or by payments into funds, such sums for the maintenance, repair, renewal, retirement, and depreciation of the property described in paragraph (a) of Section 2 hereof as may be requisite in order that such property may be returned to the Companies at the end of Federal control in substantially as good repair and in substantially as complete equipment as it was on January 1, 1918: * * *

Clearly under the contract the petitioner had a right to recover from the United States any valid claim which it might have by reason of undermaintenance of its properties during the period of Federal control. The petitioner knew that it had such a right under its contract and filed its claim with the Director General of Railroads for undermaintenance upon the basis thereof. The Director General never denied liability under the contract. The petitioner's claim was not settled in 1920. It was an outstanding claim at the close of 1920 and remained a live claim until it was finally settled by the closing agreement of 1921. The closing agreement provided in part:

> The purpose and effect of this instrument is to evidence complete and final settlement of all demands, of every kind and character, as between the parties hereto growing out of the Federal control of railroads, * * *

If any loss was sustained upon the settlement it was a loss sustained as a result of the settlement in 1921, and not a loss that is allocable to the year 1920. There was no determinable loss until the claim against the United States for undermaintenance was acted upon.

The petitioner has submitted a mass of evidence in support of its claim that it sustained a loss in 1920 as a result of the undermaintenance of its properties during the period of Federal control which was not made good by the lump-sum settlement of 1921. It has argued before the Board the validity of its claim for undermaintenance filed with the Director General of Railroads in 1920. It contends that the Director General of Railroads did not give sufficient weight to its contention for the "inefficiency of labor" during the period of Federal control in the adjustment of its claim. It presses upon the Board the merits of numerous formulæ by which it arrived at the amount of its claim for undermaintenance as contrasted with formulæ used by the Director General of Railroads in arriving at the amount of undermaintenance. We are of the opinion that no useful purpose will be served by a discussion of this evidence. It may furthermore be pointed out that the claim for undermaintenance is largely predicated upon the cost of labor and cost of materials during and at the end of the Federal control period and not upon the cost of labor and materials at December 31, 1917. We think that any capital loss deductible from gross income must be predicated upon the fair market value of the lost or destroyed property on March 1, 1913, or its cost if acquired subsequent to that date. The evidence does not establish such value or cost. We are of the opinion that if any loss was sustained as a result of the lump-

sum settlement that loss does not pertain to the year 1920, which is the only year before us with respect to which the respondent has determined a deficiency. The contentions of the petitioner upon this point are not sustained. Cf. *Missouri Pacific Railroad Co.*, 22 B. T. A. 267.

Following the precedent of this decision, it must be held, as the respondent contends, that the loss, if any, was not deductible in 1920.

We have, however, gone further and considered the merits of each of the items of alleged loss which comprise the total deduction claimed in order that there may be a full apprehension of the nature of the claim, its facts and its theory. Some of the items, such as that of the carrier's omission to show on its accounts the credit for the transportation of the alleged deficit materials which the Director General failed to apply in maintenance of road, are so palpably unsound and without color that it seems curious that they should be seriously presented. Standing alone, such a claim would be dismissed out of hand, and there is no more reason for including it among numerous others having more or less plausibility. The effect is rather to cast doubt upon the claim in its entirety.

The alleged loss of $1,491,588.80, on account of "Amount necessary to restore equipment wholly or partially consumed during Federal control," is made up as follows:

| | |
|---|---:|
| Locomotives | $471, 352. 50 |
| Freight train cars | 1, 318, 002. 36 |
| Passenger train cars | 80, 867. 79 |
| | 1, 870, 222. 65 |
| Less: Allowance by Director General in final settlement, for depreciation, retirements and fire losses | 378, 633. 85 |
| Net loss claimed | 1, 491, 588. 80 |

The processes of the petitioner's computations as to all three classes of property were the same; hence, a description of the computation in the case of locomotives will apply as well to the computations in the case of freight and passenger train cars. The statistical number of locomotive years expired during Federal control was divided by 25, alleged average service life of a locomotive, to find the equivalent statistical number of locomotives consumed during Federal control; the equivalent statistical number of locomotives consumed during Federal control was multiplied by the average cost of one locomotive, to find the statistical cost of locomotives consumed during Federal control; the statistical cost of locomotives consumed during Federal control was multiplied by a factor (different factors being used, according to whether the locomotive was acquired before or during Federal control), to equate the said statistical cost to value as of 1920,

the date of return of the property to the Lake Erie by the Director General. In the case of freight train cars, the alleged average service life is 22 years, and 30 years in the case of passenger train cars.

The theory underlying the petitioner's contention that there is a deductible loss in 1920, under section 234(a)(4) of the Revenue Act of 1918, is substantially this: That each class of equipment which the Lake Erie turned over to the Director General had a definite and determinable service life, from date of acquisition, which would be realized, under normal conditions, by proper maintenance; that a portion of the estimated service life of each class of equipment was consumed or used up during Federal control, not through lack of proper maintenance, but through the efflux of time; that the Director General was obligated, under the Federal control contract, to make good the used up service life of the equipment, or to compensate the Lake Erie therefor; that the Director General failed either to make good such used up service life, or, in the final settlement, to fully compensate the Lake Erie for his failure in that respect; and that the measure of the Lake Erie's loss is the difference between the post-Federal-control cost of a number of units having an aggregate service life equal to the total service life used up during Federal control and the amount of compensation alleged to have been allowed or paid by the Director General in the final settlement. The contention is plainly unsound.

In the first place, the Lake Erie, during the test period, in accordance with the regulations of the Interstate Commerce Commission, annually charged to railway operating expenses a prorata portion of the ledger value of each unit of equipment, determined in accordance with its service life. That charge is reflected in the average annual railway operating income of the test period, which, by the provisions of the Federal Control Act and the terms of the standard contract, was fixed as the measure of the compensation to which the Lake Erie was entitled for the Federal control period. Thus the Lake Erie has presumably been compensated in full for the consumption of service life of equipment during Federal control. But if the presumption be wrong, the lump-sum settlement precludes an enumeration of the items the Director General paid or made allowances for in the final settlement, and, therefore, the evidence does not warrant the conclusion that the Director General did not make full settlement for such alleged consumption of service life of equipment.

Secondly, the evidence as to the average service life of each class of equipment is unsatisfactory. It consists entirely of a statement by petitioner's engineering assistant to the president of his conclu-

sions, without any of the supporting facts. The following is a summary of his direct testimony: That the average life of locomotives was determined after consideration of various data available and the results of discussions at various times with locomotive men and engineers, and some compilations he made himself several years ago and particularly during Federal control, in which he made a compilation of every unit of equipment on the Nickel Plate that had been retired, from the date it started in operation until the date of the compilation, in an effort to determine what was the average life of a locomotive; that the average life of a locomotive is 25 years; that the average life of a freight car is 22 years; that 30 years is the fair average life of a passenger car; and that his opinion as to the average life of all of this equipment is a matter of his own judgment, and not the result of the application of any authoritative view. On cross-examination he testified that he did not know that the Lake Erie adopted any period as the established life of its locomotives; that it has adopted an arbitrary rate of 4 per cent of accrual; that he thinks they accrued 2½ per cent during the test period; that he guesses they went back to 4 per cent in 1920, after March 1; and that 4 per cent would represent a life of less than 25 years—figuring 15 per cent salvage, it would represent a life of 21¼ years. There are no facts in that testimony which will enable us to exercise any independent judgment, or to demonstrate the reasonableness of this witness' conclusions, as to the average life of the three classes of equipment. See *Uncasville Mfg. Co.* v. *Commissioner*, 55 Fed. (2d) 893. Without satisfactory proof as to the average service life of each of the three classes of equipment, we could not say what portion of such service life was consumed or used up during Federal control.

Thirdly, the quantum of the loss, if any, would not be determinable, for tax purposes, upon the basis of post-Federal control costs. Were it not for the intervention of Federal control, with the Government assuming the burden of exhaustion, wear and tear of the requisitioned property, the Lake Erie would have been entitled, under section 234(a)(7), to deduct from gross income of each of the taxable years embraced within the Federal control period, a reasonable allowance for exhaustion, wear and tear of the property used in its business; and such an allowance would have been determinable upon the basis of the March 1, 1913, value or cost of the property, accordingly as the property was acquired before or after that date. This deduction is expressly prescribed by the statute as that to be applied to the gradual consumption of service life. Its measure is annual exhaustion. It can not be increased by a statistical contrivance of treating the aggregate time units of numer-

ous items of property as if. they were the equivalent of a fewer number of items of property, and thus finding, contrary to fact, that such number of items has been completely exhausted and hence the subject of the loss deduction. Since exhaustion of service life is the subject only of the depreciation deduction, the quantum of such deduction depends upon evidence of basic cost or 1913 value, probable life, and the modification to be made in the usual rate by reason of extraordinary conditions in the year under consideration.

The next item included in the claimed loss deduction is $98,902.85, for "Road property retired and not replaced—normal," which is made up as follows:

Reproduction cost of property retired during Federal control, less
    depreciation, as of end of Federal control in 1920_____ $129, 535. 40
Deduct: Allowance made by Director General in final
    settlement:
        Salvage recovered_____ $36, 582. 61
        Less: Cost of demolition_____ 5, 950. 06
                                                              30, 632. 55

        Net loss claimed_____ 98, 902. 85

Much that has been said with respect to the preceding item applies with equal force to this item. Furthermore, since these were normal retirements, it must be apparent that the 113 items of road property involved were within at least 2⅙ years, the length of the Federal control period, of the end of their service life when the Director General took them over. Of the whole number of items involved, 56, or approximately one-half, were acquired by the Lake Erie and the Northern Ohio, ten or more years.before the close of the nineteenth century. The average date of acquisition was 1889. Taking December 31, 1919, as the average date of retirement, the indicated average service life was 30 years. Thus, when the Director General took the properties over, the average service life remaining was not more than    of the original service life. The cost of the properties was $61,734.01, the salvage recovered was $36,582.61, leaving $25,151.40 to be recovered through depreciation charges over the 30-year life, and only $1,676.76 to be so recovered when the Director General took the properties over. To the latter figure should be added the cost of demolition, $5,950.06; so that the loss, based upon cost, could not exceed $7,626.82. Assuming that the witness' estimate of reproduction cost at 1914 prices reflects the March 1, 1913, value of the properties, the loss based upon such value could not exceed $9,517.96. But, for reasons stated in the discussion of the preceding item, the evidence does not warrant the conclusion that the Director General did not make full settlement for this item.

The next item included in the claimed loss deduction is $4,385.62, for " Loss on gravel sold." It appears that the Lake Erie owned a gravel pit, from which the Director General sold, during Federal control, 87,712.33 cubic yards of gravel, for $4,385.62. The cost to the Lake Erie of the gravel sold was $1,096.40. The March 1, 1913, value of the gravel sold, based upon the Lake Erie's contract with the Lewisburg Stone Company, entered into in April, 1913, was equal to the proceeds realized by the Director General from the sales during Federal control. Here, also, for the reasons stated in the discussion of the first item, the evidence does not warrant the conclusion that the Director General did not make full settlement for this item.

The next item included in the claimed loss deduction is $67,248.63, for " Material purchased under hold-over contracts," which is made up as follows:

| | | |
|---|---|---|
| Cost to Director General of materials purchased under contracts entered into by Lake Erie prior to Federal control, at contract prices | | $254,537.35 |
| Estimated cost of materials had they been bought and paid for at the prices at which the Lake Erie settled with the Director General, for supplies and materials turned over by the latter at the end of Federal control | | 340,344.76 |
| Difference | | 85,807.41 |
| Deduct: | | |
| Estimated cost of material purchased by Lake Erie under contracts entered into by the Director General during Federal control, had they been bought and paid for at prices prevailing at end of Federal control | $171,906.80 | |
| Less: Cost to Lake Erie, at contract prices | 164,481.20 | |
| | 7,425.60 | |
| Adjustment by Director General of prices of materials used for additions and betterments during Federal control | 11,133.18 | |
| | | 18,558.78 |
| Net loss claimed | | 67,248.63 |

The theory underlying the petitioner's contention that this alleged loss is deductible from the Lake Erie's 1920 gross income, under section 234(a)(4) of the Revenue Act of 1918, is substantially this: That during Federal control, the Director General took advantage of certain material purchase contracts entered into by the Lake Erie prior to Federal control; that the Director General used all of the materials so purchased, and, consequently, did not turn over any of such materials to the Lake Erie at the end of Federal control; that in order to meet its post-Federal control requirements, the Lake Erie

was forced to go into the open market and purchase materials at open market prices, which, in the aggregate, were $85,807.41 higher than it would have paid for the same materials under the contracts; that after Federal control, the Lake Erie took advantage of certain material purchase contracts entered into by the Director General during Federal control; that had the Lake Erie found it necessary to purchase the same materials in the open market, it would have paid $7,425.60 more than it actually paid; that in the final settlement, the Director General made an adjustment of charges against the Lake Erie, in the amount of $11,133.18, for materials used in additions and betterments to the Lake Erie's property during Federal control; and that its loss from the aforesaid transactions is as shown by the computation above. Apparently, for some reason, the Lake Erie was unable to take advantage, in the post-Federal control period, of the material purchase contracts which it had entered into prior to Federal control.

There is no statutory loss in this item. In the first place, the petitioner's theory must necessarily include the assumption that the Lake Erie actually purchased in the open market, in the post-Federal control period, materials of the same kinds and in the same quantities as were purchased by the Director General during Federal control under hold-over contracts, and that the Lake Erie paid for those materials, at the prices at which it settled with the Director General for similar materials and supplies turned over to it by the latter at the end of Federal control; and the assumption is wholly without any foundation in the evidence. Second, even if the assumption were true, the actual cost to the Lake Erie of the materials purchased in the post-Federal control period is a proper charge against operating expenses and a proper deduction in computing taxable net income, as and when such materials are actually used; and there is no evidence that the petitioner's accounting practice has not conformed with the rule. Third, it is clear from the evidence that some, and possibly all, of the materials purchased by the Director General during Federal control under hold-over contracts were used in maintaining the Lake Erie's properties during Federal control; hence the Lake Erie has not suffered by reason of the Director General having taken advantage of the hold-over contracts, except to the extent that the Director General may have used some of those materials for the benefit of another carrier, and that is not shown by the evidence. Fourth, as in the case of all preceding items, the evidence does not warrant the conclusion that the Director General did not make full settlement for this item.

The next item included is $160,868.68, for "Losses on additions and betterments," which is made up as follows:

Cost of reproduction in kind, as of Federal control period, of road
 properties retired and replaced by the Director General during
 Federal control _____ $278, 699. 04
Less: Actual cost to Lake Erie and Northern Ohio of the road
 properties so retired and replaced, which cost was allowed by the
 Director General as a credit against the charges which he made
 to the Lake Erie for additions and betterments of the Federal
 control period_____ 117, 844. 23

        Net loss claimed on this item_____ 160, 868. 68

The theory of the petitioner's contention is that the Director General, in charging the Lake Erie for additions and betterments made during Federal control, should have allowed credit, not, as he did, for the original cost or ledger value of the road properties retired and replaced by additions and betterments, but for the cost of reproduction in kind, as of the Federal control period, of the road properties retired; and that to the extent that the credit allowed is less than such reproduction cost, his charges for additions and betterments against the Lake Erie are excessive and the latter suffered accordingly.

In the first place, the evidence is entirely inadequate to show cost of reproduction in kind, as of the Federal control period, of road properties retired and replaced by the Director General. It consists entirely of testimony of the engineering assistant substantially as follows: That the amounts shown in column 6 of Exhibit 84 are the amounts which were shown in the claims of the company against the Director General; that he did not prepare the claims, nor has he ever inspected or seen any of the properties retired; column 6 shows the reproduction value of the several facilities as of the time of their respective constructions; and that the reproduction values in column 6 did not appear on the company's books. That is all of the evidence there is bearing on the point; and it certainly falls far short of its purpose. Second, the Director General allowed the Lake Erie the full cost of the retired facilities, notwithstanding that the Lake Erie had used those facilities for some time previously. Thus the Lake Erie was required to pay for the additions and betterments only the difference between the cost thereof and the cost of the retired properties unreduced by any exhaustion, wear and tear. We can not see in that situation how the Lake Erie sustained any loss. By allowing the full amount of original cost of retired facilities as a credit, the Director General fully compensated the Lake Erie, and precluded any possible loss.

The next item included in the claimed loss deduction is $273,294.45 for "Loss on ties," divided into two parts, "Zinc chloride ties, $60,158.80" and "Shortage of ties, $213,135.65." As to the first part of the item, the petitioner says that during the Federal control

period, the Director General applied to the Lake Erie's roadway 116,068 zinc chloride ties, instead of creosote treated ties which the Lake Erie and Northern Ohio had used previous to Federal control; that the average service life of a zinc chloride tie is 3.2 years less than that of a creosote treated tie; that for each zinc chloride tie so applied, the Lake Erie has sustained a loss of the mathematical co-efficient of value of 3.2 years in terms of the market value of the creosoted tie; and that the market value of a creosoted tie, as of the end of Federal control, was $2.30.

We see no merit whatever in the petitioner's contention as to the first part of the item. Apparently, when the Director General took over the Lake Erie's system of railroads, the condition of 116,068 creosoted ties in the roadway was such that he found it necessary to replace them before the end of Federal control. The remaining service life in those ties, when the Director General took over the property, was, at most, two years. When the Director General returned the properties to the Lake Erie, the 116,068 creosoted ties had been replaced by a like number of zinc chloride ties with a remaining service life of approximately eleven years. Wherein is there any loss in that situation? The petitioner says that it will have to replace the zinc chloride ties about 3.2 years sooner than would have been the case had the Director General used creosoted ties. But what of it? When it does replace the zinc chloride ties, it may take its proper tax deduction for this item of maintenance. Second, the contention that the market value of a creosoted tie, as of the end of the Federal control period, was $2.30 is not sufficiently supported by the evidence. It is entirely based upon the engineer's statement that "the price of $2.30, at the end of Federal control, is about the price that we were paying for ties at that time." Another witness for petitioner testified, in connection with the preceding issue, that the average price for treated ties in the guaranty period was $1.49085 per tie; and there is evidence in the record that the trend of material prices was upward through all of 1920, at least to November.

As to the second part of the item, the petitioner says that the Director General replaced proportionately less ties during Federal control than were replaced by the Lake Erie during the test period; and that the resulting loss to the Lake Erie and the Northern Ohio is the cost of purchasing and installing, as of the end of Federal control, sufficient ties to make up the alleged net shortage. This cost the petitioner says is $213,135.65. While the evidence indicates that the Director General did replace proportionately less ties during Federal control than were replaced by the Lake Erie during the test period, it can not be said on this record that the Director General did not make full settlement for any Federal control under-maintenance resulting from any deficiency in tie replacements.

The last item included in the claimed loss deduction is $7,332.81, for "Transportation on Deficit Material." This is the colorless claim to which we have already referred. The petitioner is evidently contending that this is the amount of additional revenue which the Lake Erie would have accounted for as realized from the transportation of ties, over its own lines, had it not been for the Director General's deficiency in tie replacements during Federal control. In other words, in the preceding item the petitioner contends that the Director General during Federal control consumed and failed to restore some 84,000 treated and untreated ties and 376,000 feet, board measure, of switch and bridge ties; and the petitioner says that, had the Director General bought and installed the said ties during Federal control, the amount of revenue which it would have accounted for as if received, for transportation of said ties over its own lines, would have been $7,332.81; and, therefore, that the Director General's failure to so purchase and apply the said number of ties resulted in a loss of that amount to the Lake Erie and the Northern Ohio.

The mere statement of the proposition ought to be sufficient to show that it is without merit. There is no provision which will permit a taxpayer to take a loss deduction for its failure to realize an accounting credit which might have inured to it if things had not happened as they did.

The deduction claimed in this issue is thus found to be entirely without merit, and leaves the respondent's determination of deficiency unaffected.

*Judgment will be entered under Rule 50.*