ILLINOIS CENTRAL RAILROAD COMPANY AND YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 62023, 62991. Promulgated June 29, 1934.

*R. C. Beckett, Esq.*, for the petitioners.
*J. L. Backstrom, Esq.*, for the respondent.

### OPINION.

TRAMMELL: Respondent determined deficiencies in income tax of $27,088.88 for 1926, $84,611.39 for 1927, $46,663.09 for 1928, and $29,463.82 for 1929. Petitioners allege that respondent's determinations are erroneous in that as to each taxable year he did not deduct from the income of the Yazoo & Mississippi Valley Railroad Co. the cost of replacements of leased property. The respondent claims increased deficiencies for all of the taxable years, alleging that he erred in allowing deductions from the income of the Yazoo & Mississippi Valley Railroad Co. (1) of $142,248.26 for 1926, $148,603.57 for 1927, $158,959.70 for 1928, and $68,441.88 for 1929, representing the excess of cost of items of roadway and structures leased from the Alabama & Vicksburg Railway Co., which were replaced, over the value of the salvage recovered; (2) of $86,871.44 for 1926, $144,415.44 for 1927, $126,569.21 for 1928, and $163,660.52 for 1929, representing the excess of cost of items of roadway and structures leased from the Vicksburg, Shreveport & Pacific Railway Co., which were replaced, over the value of the salvage recovered; (3) of $17,938.74 for 1926, $19,999.74 for 1927, $16,513.90 for 1928, and $9,523.34 for 1929, representing the labor cost of removing replaced rail and other track material from, and the labor cost of laying new rail and other track material replacements on, the roadway leased from the Alabama & Vicksburg Railway Co.; (4) of $14,500.60 for 1926, $21,492.94 for 1927, $11,101.98 for 1928, and $13,461.22 for 1929, representing the labor cost of removing replaced rail and other track material from, and the labor cost of laying new rail and other track material replacements on, the roadway leased from the Vicksburg, Shreveport & Pacific Railway Co.; and (5) of $74,774.05 for 1929, for depreciation of railway equipment now alleged by the petitioner to have been transferred by the Yazoo & Mississippi Valley Railroad Co. to

the Alabama & Vicksburg Railway Co. and the Vicksburg, Shreveport & Pacific Railway Co. in that year to replace equipment retired. The parties submitted a stipulation embodying substantially all of the material facts, which is incorporated herein by reference. The proceedings were consolidated for hearing and decision.

Petitioner Illinois Central Railroad Co. is an Illinois corporation, with its principal office at Chicago. It filed consolidated returns for the taxable years, for itself and its subsidiaries, which included the net income of petitioner Yazoo & Mississippi Valley Railroad Co. It is liable for any and all deficiencies, and is entitled to recover any overpayment for 1929 based upon the consolidated returns.

On March 31, 1925, the Yazoo & Mississippi Valley Railroad Co., hereinafter called the lessee, entered into separate agreements with the Alabama & Vicksburg Railway Co. and the Vicksburg, Shreveport & Pacific Railway Co., hereinafter called the lessors, by the terms of which it leased the properties of the two last mentioned companies until July 1, 2282, with options to renew the leases for an additional period of 999 years. The lessee agreed that it would keep up, maintain, repair, replace, and renew the leased properties during the terms of the leases so that such properties would at all times be in substantially as good repair, working order, and condition as of the effective date of the lease agreements; and it further agreed, that whenever during the terms of the leases any part of the leased properties, including rolling stock and equipment, should be damaged, destroyed, or otherwise become unfit for its appropriate use and purpose, to cause the same to be repaired, renewed, rebuilt, or replaced by property of equal value. These covenants were to be performed at the lessee's sole cost and expense. The lease agreements also provided that the lessee should have the right to make such additions and extensions to, and betterments and improvements of, the leased properties as it deemed necessary, for which it was to be reimbursed by the lessors. The leases became effective on June 2, 1926, and the lessee took over the leased properties on the same day.

During the taxable years the lessee made substantial replacements of rail and other track materials on the leased roadways. In most, if not all, instances the rail and other track material replacements were heavier than the rail and material removed from the roadways, and to that extent were betterments or improvements of the leased properties. Substantial portions of the lessee's expenditures for such replacements were charged to and borne by the lessors, as the costs of the betterments or improvements. The following statement shows for each taxable year the actual cost, exclusive of labor, of rail and other track material replacements made by the lessee, the part of such cost charged to and borne by the lessors, and the cost to replace

the removed rail and other track material in kind, which was borne by the lessee:

|  | 1926 | 1927 | 1928 | 1929 |
|---|---|---|---|---|
| Cost of replacements | $394,875.75 | $427,166.24 | $399,714.22 | $320,032.73 |
| Charged to lessors | 61,974.23 | 68,453.73 | 58,942.51 | 50,672.52 |
| Cost to replace in kind borne by lessee | 332,901.52 | 358,712.51 | 340,771.71 | 269,360.21 |

The labor costs incurred and borne by the lessee in making the replacements were $32,439.33 for 1926, $41,492.71 for 1927, $27,615.87 for 1928, and $22,984.56 for 1929. One half of these labor costs were incurred in taking up the removed rail and other track materials and one half in laying the replacements.

Also, during the taxable years the lessee replaced 57, more or less, bridges and trestles on the leased roadways. In most, if not all, instances the replacements were improvements over the removed structures. Substantial portions of the lessee's expenditures for such replacements were charged to and borne by the lessors, as the costs of the betterments or improvements. The following statement shows for each taxable year the actual cost of such replacements made by the lessee, the part of such cost charged to and borne by the lessors, the part of such cost borne by the lessee, and what it would have cost to replace the structures in kind:

|  | 1926 | 1927 | 1928 | 1929 |
|---|---|---|---|---|
| Cost of replacements | $65,560.82 | $50,321.05 | $181,115.43 | $268,126.92 |
| Charges to lessors | 27,904.76 | 40,916.79 | 128,773.23 | 190,689.90 |
| Cost borne by lessee | 37,656.06 | 9,404.26 | 52,342.20 | 77,437.02 |
| Cost to replace in kind | 42,095.92 | 21,755.78 | 134,480.66 | 145,855.31 |

In each instance, the part of the cost borne by the lessee is equal to the cost to the lessors, of the removed structures.

Further, during the taxable years the lessee replaced other parts of roadways and roadway structures, extended and rearranged existing trackage, constructed new facilities, installed tie plates, and otherwise made changes on the leased properties. Most, if not all, of these changes were betterments or improvements of those properties. Substantial portions of the lessee's expenditures for such changes were charged to and borne by the lessors as the costs of the betterments and improvements. The following statement shows for each taxable year the actual cost of the changes made by the lessee, the part of such cost charged to and borne by the lessors, the part of such cost borne by the lessee, and what it would have cost to replace all removed properties in kind:

|  | 1926 | 1927 | 1928 | 1929 |
|---|---|---|---|---|
| Cost of changes | $23,665.41 | $355,855.39 | $127,393.98 | $152,971.38 |
| Charged to lessors | 20,974.38 | 282,126.57 | 106,155.71 | 121,238.20 |
| Cost borne by lessee | 2,691.03 | 73,729.62 | 21,238.27 | 31,733.18 |
| Cost to replace in kind | 2,300.70 | 87,796.89 | 25,213.50 | 37,951.16 |

The costs borne by the lessee, except for $283.80 in 1926, $36,174.22 in 1927, and $6,470.90 in 1928, are equal to the costs to the lessors, of items of roadway and roadway structures that were removed in making the changes. As to the excepted costs, they represent actual costs to replace the properties in kind.

In computing the lessee's net income for the taxable years, the respondent allowed deductions of $229,119.70 for 1926, $293,019.01 for 1927, $286,528.91 for 1928, and $232,102.40 for 1929, representing in each instance the cost to the lessors, less salvage recovered, of the leased properties that were replaced during the taxable years; and, also, he allowed deductions of the amounts enumerated above as the labor costs incurred and borne by the lessee in making the rail and other track material replacements. He now asserts that he erred in allowing any and all of these deductions. Petitioners concede that the lessee is not entitled to the deductions allowed by the respondent in respect of the leased properties that were replaced, since the lessee was not the owner thereof and had no capital investment in those properties. We agree with that concession, because it is in line with the authorities on the question, *Duffy* v. *Central R.R. Co.*, 268 U.S. 55; *Weiss* v. *Wiener*, 279 U.S. 333; *Brevoort Hotel Co.* v. *Reinecke*, 36 Fed. (2d) 51; *Belt Ry. Co. of Chicago*, 9 B.T.A. 304; aff'd., 36 Fed. (2d) 541; certiorari denied, 281 U.S. 742; and *Michigan Central R.R. Co.*, 28 B.T.A. 437; and the respondent's claim for increased deficiencies is allowed to that extent. Petitioners contend, however, that the lessee is entitled to deduct from the income of each taxable year an amount equivalent to what it would have cost to replace the properties in kind.

As to the expenditures for rail and other track material replacements on the leased properties, including the labor costs of making them, there can be no doubt that, to the extent they were actually borne by the lessee, they constitute ordinary and necessary expenses of its business and are deductible in computing taxable net income. The maintenance engineer of the petitioners testified that the replaced rail was from 12 to 18 years old and in poor condition; that the replacements were made in pursuance of the maintenance program adopted and followed by the Illinois Central, of which the lessee is a subsidiary line; and that such replacements were necessary to the proper upkeep and maintenance of the leased properties.

There is nothing in the record to the contrary. The expenditures are ordinary in the business in which the lessee is engaged and they are necessary, because the lessee was required to make them in the performance of its covenants to keep up and maintain the properties. To the extent indicated, the expenditures did not contain anything of a capital nature; the cost of the additions, betterments, and improvements were charged to and borne by the lessors. Obviously, the deductions must be limited to the lessee's burden of the expenditures; for the statute will not permit the deduction of amounts for which it was reimbursed, or to be reimbursed, by the lessors. *New York, Chicago & St. Louis R.R. Co.*, 26 B.T.A. 1229, 1289, and cases therein cited.

As to the second group of expenditures, for replacement of bridges and trestles, and the third group, for so-called " miscellaneous roadway replacements ", the evidence is insufficient, in respect of all but three items, to enable us to determine whether or not they may be deducted from income, even to the extent that they were borne by the lessee. While expenditures for ordinary upkeep and maintenance, such as those for rail and other track material replacements referred to above, are proper deductions from income, the lessee may not deduct expenditures made primarily for adding to and improving the leased properties. *Duffy v. Central R.R. Co.*, *supra*.

The witness, heretofore referred to, without stating his reasons therefor and apparently basing his opinion on the meager facts in the stipulation, expressed the opinion that all of the expenditures were necessary to the proper maintenance of the leased properties. If by that he meant that they were necessary in order to keep the properties in good repair and good running condition, and no more than that, the inaccuracy of his opinion is clearly disclosed by the stipulated facts. The depression and rearrangement of existing tracks, the construction of concrete subways where none existed before, the extension of yard leads, and the application of more than a hundred thousand additional tie plates to the roadways are clearly betterments or improvements and cannot categorically be ascribed to that kind of upkeep and maintenance that may be deducted from income. Further, it is to be noted that some of the bridges and trestles replaced in the taxable years were constructed or erected as late as 1917 and 1918, and, as to them, while we have been given no evidence as to the usual normal life of this type of structures, there obviously must be some doubt that their replacement was due to normal upkeep and maintenance rather than to bettering or improving the leased properties. As to all of the expenditures included in these two groups, the stipulated facts, except as to three items, contain only a very meager description of what was done, the cost, the respective parts of the cost that were borne

by the lessors and lessee, cost of the replaced items of roadways and roadway structures, and the value of the salvaged materials; and none of the facts as to the reasons and necessities for what was done have been given to us. In this state of the record, we are unable to determine the extent to which these expenditures, other than the three excepted items, fall within the categories of deductible expenses and nondeductible capital expenditures.

The three excepted items are $283.80 expended in 1926 for replacing a wornout cypress shingle roof on a section house; $36,174.22 expended in 1927 for replacing 17 miles of main track that had been washed out by flood conditions; and the cost of replacing 36,292 tie plates in 1928. The cost of the latter item is not separately shown, but is included in the lessee's cost of $6,470.90 for installing 156,193 tie plates, of which 119,901 were new installations and 36,292 were used for replacements. The cost of the replacements is determined to be 36292/156193 of the total cost, or $1,503.54. These three items are proper deductions in computing the lessee's taxable net income. Deduction of the remaining expenditures in the second and third groups must be denied for lack of proof that they are ordinary and necessary expenses.

During the taxable years and 1930, the lessee retired units of leased equipment, such as locomotives and freight train cars, as follows: 81 in 1926, 757 in 1927, 389 in 1928, 164 in 1929, and 73 in 1930, a total of 1,464 units, having a depreciated book value as of June 2, 1926, as agreed upon by the lessee and lessors, of $1,157,752.92. As each equipment unit was retired, the lessee recorded its liability for replacement thereof on its books in an amount equal to its depreciated book value at June 2, 1926, by a credit to the account of the lessor owning the unit. These retired units were replaced by the lessee with equipment furnished by the petitioner, as guarantor under the lease agreements, as follows: 577 units in 1929, and 29 units in 1930, a total of 606 units; but title thereto was not conveyed to the lessors at the times of replacement. The value of these replacement units, on the petitioner's books, which was cost less depreciation previously allowed, was $1,020,121.99; but for the purposes of the replacements, the lessee and lessors agreed upon values of $1,103,579.22 for the 1929 replacements, and $60,408.60 for the 1930 replacements, a total of $1,163,987.82. In August 1929 it was agreed that the lessee should convey to the lessors title to all such equipment replacements and to such other equipment as was necessary to replace all units of leased equipment that had been and would be retired up to December 31 of that year, in order that all such equipment replacements might be brought immediately within the liens of the lessor's mortgages. By reason of the delay in agreeing upon the values and classes of replacement units that were to be conveyed by the lessee to the lessors,

the conveyances of title were not formally made to the lessors until 1932. The accounting for the transfer of the replacement units was made on the books of the lessee and lessors in 1932.

Petitioners contend that the lessee is entitled to deduct from 1929 income the amount of its entire liability to the close of that year in respect of equipment replacements required to be made under the provisions of the lease agreements and lessors' mortgages. The respondent says that if the deduction is to be made at all, it must be from the income of 1932, the year in which the lessee formally conveyed the replacement units to the lessors. We disagree with both positions. Under the lease agreements, the lessee was required immediately to replace all units of equipment retired from service. Therefore, as and when the lessee retired a unit of equipment, a liability *in praesenti*, to make replacement, was created. The amount of the lessee's liability was measurable, under the terms of the lease agreements, by the value as of June 2, 1926, of the equipment units retired. Consequently, the lessee's liability to replace was fixed and determined at the time each unit of equipment was retired and was definitely ascertainable in amount. The lessee's books were kept on an accrual basis, and the accounting for its liability to the lessors was made at the time the equipment units were retired. Under the circumstances, the amount to be deducted from the lessee's income of any taxable year on account of its replacements of equipment is the aggregate value, as of June 2, 1926, of the equipment units retired during that particular taxable year. Cf. *Lucas* v. *American Code Co.*, 280 U.S. 445. While the number of equipment units retired in each taxable year is shown, there is no evidence upon which we can determine the amount of the lessee's liability as to each such taxable year. Accordingly, the issue must be resolved against the petitioners.

The fifth ground assigned by the respondent as the basis for his claim to increased deficiencies, particularly, in this instance, as to 1929, is an alternative matter and is pressed only in the event that the Board should decide that the lessee is entitled to deduct from the income of that year the amount of its entire liability to the close of the year in respect of equipment replacements. While our decision on the latter question obviates the necessity for passing upon the respondent's alternative claim, we would feel constrained to hold adversely to him if a decision were necessary, since the lessee was the actual owner of the replacement units until it formally conveyed them to the lessors in 1932, and, accordingly, it is entitled to the depreciation deduction, in respect of such units, which the respondent allowed for 1929.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*